REES v. PELLOW.

(Circuit Court of Appeals, Sixth Circuit. October 23, 1899.)

No. 675.

1. BROKERS—TERMINATION OF AGENCY BY PRINCIPAL.

A broker's agency for the sale of property having no limit as to time may be terminated at any time by the principal, subject to the ordinary requirements of good faith.

2. SAME—NOTICE OF TERMINATION.

A letter written by a principal to a broker, terminating his agency to sell property, and addressed to his place of residence, where it was deliv-

ered at his office, took effect from the date of such delivery, although, by reason of the broker's absence, which was unknown to the principal, he did not personally receive it until his return, some weeks later, he having in the meantime taken no action in the matter of the agency.

**3. SAME—CONSTRUCTION OF CONTRACT—RIGHT TO COMMISSIONS.**

Defendant, who was the owner of stock in an iron-mining company, in connection with another stockholder, gave to plaintiff an option by which he agreed to sell his stock to plaintiff, or to any purchaser procured by plaintiff, at a stated price. Plaintiff did not contemplate purchasing the stock himself, but selling it at a profit. He entered into negotiations with a third party for the sale of the stock at an advance, in which he was assisted by defendant, but the terms of payment offered were not satisfactory to the sellers, and the negotiations failed. Three months after the option was given, defendant gave plaintiff notice of its withdrawal, and advanced the price of his stock beyond that asked for it by the plaintiff, and at such advanced price he and the other stockholder afterwards sold the stock to the same parties with whom plaintiff was negotiating. *Held* that, in the absence of evidence which would warrant a finding that defendant acted in bad faith in terminating the option, plaintiff was not entitled to recover commissions as for a sale made under the contract, or on a quantum meruit for services rendered.

**4. SAME.**

The fact that, pending the negotiations begun by plaintiff, defendant demanded and obtained a modification of the option contract, allowing him a share of the profit to be made by plaintiff in case the sale was consummated, in consideration of his assistance therein, would not operate to make him plaintiff's agent in renewing the negotiations on a different basis after the option contract was terminated.

In Error to the Circuit Court of the United States for the Western District of Michigan.

This was an action brought by the defendant in error, Thomas Pellow, against William D. Rees, the plaintiff in error, to recover commissions claimed to have been earned under an option contract for bringing about the sale of 9,000 shares of stock owned by the said Rees. There was also a count upon a quantum meruit. Upon the trial of the cause the court instructed the jury to find for the defendant upon the count in contract, upon the ground that the plaintiff, Pellow, had not made the final sale of said stock, but that same had been sold by the owner, said William D. Rees. So far as the action was one to recover the reasonable value of services rendered by said Pellow in procuring a purchaser for the said shares, the court instructed the jury as follows: "But the case will be submitted to you upon the claim of the plaintiff for the value of his services. If the jury are satisfied by the evidence that the negotiations commenced by Pellow for the sale of defendant's stock to Corrigan, McKinney & Company were not broken off until the stock was finally sold by Rees to those parties in November, but were continuous throughout, and while defendant's authority to Pellow in the so-called 'option contract' continued the defendant stepped into the pending negotiations, and assumed the control of them for himself, and succeeded in conducting them to an advantageous sale, and you further find that the defendant derived advantage from Pellow's efforts in the negotiations, in that they were efficacious in bringing about the sale which was finally reached, then the plaintiff, having been interrupted in conducting the negotiations he had begun, and prevented from earning the commission that he might have earned but for the intervention of the defendant, is entitled to recover what his services were reasonably worth to the defendant." There was a verdict and judgment in favor of the defendant in error for the sum of $2,430, and a writ of error has been sued out by the plaintiff in error.

The undisputed evidence established:

First. That William D. Rees and Samuel Mitchell were owners of a large majority of the shares of the capital stock of the Blue Iron Mining Company, an iron-mining corporation of the state of Michigan, whose mines were situated

at Negaunee, Mich., and that Pellow was the owner of a small number of shares. Mitchell, who was the uncle of Pellow, was the president of the corporation, and Pellow its secretary and treasurer. Rees was a director in the company. Mitchell and Pellow resided at Negaunee, and Rees at Cleveland, Ohio. The corporation was organized for the purpose of operating an iron mine under a lease, by the terms of which a royalty was paid upon the ore mined. Active operations had ceased some time prior to the transactions out of which this suit arose on account of the inability of the company to profitably carry on mining operations under the terms of the lease. Fruitless efforts had theretofore been made to secure a reduction in the royalty, that operations might be resumed. In this condition of affairs there arose a strong desire to make a sale of the property through a sale of all or a majority of the shares. Under these circumstances Pellow sought to obtain from both Rees and Mitchell authority to sell their holdings of stock for the sake of the commissions. Mitchell readily agreed to sell his stock to Pellow, or through him, at two dollars per share, and Rees orally agreed to place his stock in his hands to be sold with that of Mitchell on the same terms. The agreement with Rees was confirmed by a letter dated August 5, 1896, in the following words:

"Mr. Thomas Pellow, Negaunee, Mich.—Dear Sir: I shall be glad to hear from you whenever you have anything of interest to say with regard to your prospects of disposing of the stock of the Blue mine. Confirming my verbal agreement, I will join Capt. Mitchell in selling to you, or through you, my stock in the Blue mine at $2.00 per share, and if, during your negotiations, Capt. Mitchell should be willing to take less than that for his stock, I will agree to the same reductions on my shares.

"Yours, truly, W. D. Rees."

Pellow had, in a prior stage of the negotiations with Rees, applied by letter for an option for the definite term of 60 days. This Rees declined, but gave the option above set out, in which no time is fixed.

Second. No sale of the stock having been consummated, Rees, on November 6, 1896, revoked his option by a letter in the following words:

"Mr. Thomas Pellow, Negaunee, Mich.—Dear Sir: Three or four months ago I joined Capt. Mitchell in an option to you on my stock in the Blue Iron Ming. Co., about which we have had some correspondence. I extended the option from time to time, but it has now been running so long that I feel justified in withdrawing it entirely. That the trade has not gone through has been through no fault of mine, for I have done all I could to further it; in fact, have done more to promote the trade than any one else. You will therefore please consider the option canceled.

"Yours, truly, W. D. Rees."

Third. On November 24, 1896, Rees sold both his own stock and that of Mitchell to the firm of Corrigan, McKinney & Co. for three dollars per share. The terms of sale were: Cash, $10,000; $30,000 in four months, with security; balance payable in installments, for which the notes of the firm were taken, secured by the stock as collateral. The purchasers also agreed to take the stock of all others at the same rate if offered within 30 days. Pellow put his own stock into this sale, as did all other stockholders. The proceeds of sale as they came in, the payment of deferred notes having been anticipated by the buyers, were distributed by Pellow among the stockholders in his character as secretary and treasurer. When the last of the purchase money had been distributed, Pellow for the first time presented a claim for the commissions alleged to be due him as for bringing about this sale. This claim was for 75 cents per share for the sale of Rees' 9,000 shares. This reduction from a commission of one dollar on each share was in consequence of a modification of the original option contract of August 5, 1896, averred to have been made about September 24, 1896, and came about, as the evidence tended to show, as follows: Immediately upon securing the option, Pellow opened negotiations for the sale of the stock of the company to Corrigan, McKinney & Co., the same firm who ultimately bought through Rees. That firm owned and operated an iron mine adjoining that of the Blue Iron Mining Company, having a lease on the property from the same persons owning the fee in the mines worked by the latter-mentioned company. Each mine produced the same character of

ore, and they were competitors in business. All the members of the firm of Corrigan, McKinney & Co. lived at Cleveland, the residence of Rees. Pellow's negotiations were opened with and conducted through the manager of the Corrigan, McKinney & Co. mines, who resided at Negaunee, the residence, also, of Pellow and Mitchell. Pellow offered the stock at $2.50 per share. This price was apparently satisfactory, though the purchasers were unwilling to pay cash, but expressed a willingness to pay a small sum in money as an evidence of good faith, and give the firm's notes secured by the stock for deferred payments. Pellow advised Rees of the attitude of Corrigan, McKinney & Co., the price at which he had offered the stock, the willingness of the purchasers to pay part cash, and asked Rees as to the solvency of the firm, and as to his willingness to sell upon the credit proposed. Rees, under date of August 19th, expressed confidence in the financial ability of Corrigan, McKinney & Co. and his willingness to accept their paper, but deferred the matter to Mitchell. This letter was mailed to Mitchell, to be delivered to Rees if Mitchell approved the sale on the credit desired. Rees further expressed the notion that the sale should reserve to the stockholders certain money in the treasury of the company, which he thought should be distributed as a dividend to the shareholders before the sale. To this Pellow demurred, saying that he had stated to the purchasers that this money would be an asset acquired by them. He also stated, in reply to Rees, that he had required the buyers to pay one dollar cash on each share, and the balance upon a credit, and that this proposition had been forwarded by Mr. Cole, the local manager for Corrigan, McKinney & Co., to the firm at Cleveland, and that he was in daily anticipation of a favorable reply. Under dates of September 20th and 21st, Pellow wired and wrote Rees that Corrigan, McKinney & Co. wanted to discuss the deal with him (Rees) at Cleveland, and gave him to understand that they wished to obtain from him some collateral promises in reference to outside matters, and to arrange amount of cash payment and time to be given on deferred payments. He urged Rees to stand firmly by $2.50 as the price for the stock, as he was sure they would pay that price, and wanted the property. He also notified Rees that he had asked Mitchell to go to Cleveland to consult with him (Rees) as to the sale, and to represent him (Pellow) in concluding the transaction. According to an understanding with Rees, Mitchell did go to Cleveland, and several interviews took place there between Rees and Corrigan, representing Corrigan, McKinney & Co., and between Rees and Mitchell. During these negotiations at Cleveland, Rees wrote Mitchell, under date of September 24, 1896, as follows:

"Since I saw you last night, I have been thinking over the 'Blue' matter. It must be apparent to you, as well as to Pellow, that I am doing more than half the work to place this property, if it is placed at all. Corrigan, McKinney & Co. would not touch it without certain promises and encouragement from me, and Pellow's effort to place the stock is a failure without my help, and concessions on my part as to the terms of payment. I am quite willing that Pellow should be compensated for his share of the work, but I feel that on my stock that I should have a share of the margin there is in it. 25 cents per share will certainly fully compensate Pellow for any work he has done towards placing my stock, and, under the circumstances, I do not think he ought to have any more. In your case, you may, through your relations to Pellow, be willing to overlook the matter, but in my case it is simply business."

This letter was inclosed by Mitchell in one written by himself to Pellow as follows:

"Cleveland, Ohio, Sept. 24, 1896.

"Dear Nephew: Your letter and message in answer to mine rec'd. Those people are very hard people to make a deal with. They talk as if they do not want the property, & also that Mr. Cole said that he thought it could be got for 2.20 or 2.25 per share. I told them that if he said that he must of meant (clear) of the money in the treasury & etc.'s. After talking all the afternoon yesterday, Corrigan thought that it might be possible that Judge Burke would consider it, if we were willing to take 12 equal payments, commencing Oct. 1/97, as per my telegram to you. In order to consider this, they want Rees to agree to work for their interest in getting the royalty fixed up & also promise

them the **Lucky Star** property, or his influence to get **it**. Now, Mr. **Rees** thinks that, as long as he has to work to help the matter through, **he** ought to be entitled to a division of the margin that you would make, viz. **25** cents, etc., or half the profits. He has just left here, and after a long talk, in which I told him, he gave the option which he admitted, but said it was on different terms.—that he never expected to be asked to take notes, or to make promises about properties, etc.'s, and that he is willing to take the 2.00 per share, etc., now (in cash), or even half cash & half notes, which they say they cannot pay. They say there is no use talking cash, because they have not got it, & cannot get it. But that the notes will be paid when due, with 6 per cent. interest. Now, Mr. Rees wanted me to send you the letter he sent me at the hotel this a. m., and ask you to telegraph as soon as received, whether you were willing to concede the 25 cents per share. I do not know what to say in this matter. I worked with Corrigan to see if I could get 50 cents per share cash, including what is in the treas., & he could not. Now we are letting it go on speculation & taking notes for say, 2 yrs., or an average of 1½ yrs. In the meantime, if McKinley should be elected, we might be able to sell for cash & get more, long before those payments would commence. You have the situation exactly & can wire me, or Rees, as you please, what you think about it."

Under date of September 26, 1896, Pellow wired Mitchell as follows:

"Am willing to concede Rees twenty-five cents on his own stock, but you do as you please with the deal. We should not turn over what cash we have, but keep it on account."

This negotiation at Cleveland came to nothing owing to an inability of the parties to agree upon the terms of sale in respect to the cash to be paid and the credit to be given, and Mitchell, with the approval of Rees, went to Chicago to see their lessors, and obtain, if possible, such reduction in royalty as would justify them in the resumption of active mining operations. Pellow, about the 1st of October, went to Canada, partly for pleasure and partly on private business. There he remained until November 28th, when he returned to Negaunee, and found on his office table Rees' letter, revoking the option of August 5th. During his absence, Pellow took no step whatever in furtherance of any sale, and seems to have been altogether ignorant of the further history of the matter until informed of the sale, which had been made during his absence in Canada. After the breaking off of the Cleveland conferences between Rees and Corrigan and the resumption of efforts to obtain such concessions from the lessors as would enable the company to continue business, there occurred other conferences between Rees and Corrigan in reference to a sale, and much correspondence passed between Rees and Mitchell on this subject, as well as touching a resumption of mining operations. The whole of this correspondence was in evidence. From it, together with the oral evidence of both Rees and Mitchell, it was contended for Pellow that there had been a continuous negotiation, and that, when Rees wrote his letter of November 6th), the original negotiation was still on, with an increasing promise of fruitful results, and that any services rendered by Rees in concluding the negotiations were compensated by the modification of the option contract heretofore mentioned. It was also contended that the rescission of the option was in bad faith, and done for the purpose of getting the benefit of the services of Pellow in bringing about the original negotiation with the ultimate purchasers, without compensating him according to the terms of the option. The circuit judge, as before stated, instructed the jury that they must find for the defendant in so far as the suit was for commissions as for making the sale, but that, if they found that the negotiations begun by Pellow were continuously carried on by Rees, although the terms were changed, they might find for Pellow the reasonable value of his services to Rees, so far as they had been "efficacious in bringing about the sale which was finally reached."

James H. Hoyt, for plaintiff in error.
C. R. Brown, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SWAN, District Judge.

LURTON, Circuit Judge, having made the foregoing statement of facts, delivered the opinion of the court.

The agreement between Rees and Pellow, evidenced by the letter of August 5, 1896, has a double aspect, and must be construed accordingly: First, it was an option to join Mitchell, and sell to Pellow at a fixed price; second, this option was coupled with an agency to sell, in conjunction with Mitchell, to others at the same price.

So far as it was an option to Pellow himself, it was revocable at any time before acceptance. Stitt v. Huidekopers, 17 Wall. 384–394. There is no pretense that Pellow ever accepted the offer, or even had any purpose to do so. This aspect of the case may, therefore, be dismissed.

We come to the proposition as one of agency. There was no consideration for this agency, and no limit upon its duration. It was, therefore, subject to be terminated in good faith at the will of the principal; otherwise, there would be no means of relieving the principal from an authority exercised under it at any length of time after it was made, no matter what the change of circumstances. Stitt v. Huidekopers, supra; Story, Ag. § 463; Hale v. Kumler, 54 U. S. App. 685–695, 29 C. C. A. 67, and 85 Fed. 161. In Sibbald v. Iron Co., 83 N. Y. 378–384, the rule as to revocation is very admirably stated as follows:

"Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith. Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, subject, of course, to the right of the seller to sell independently. But, that having been granted him, the right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions."

So far as this option was coupled with an agency, it was terminated by Rees' letter of November 6, 1896, expressly revoking it. That revocation, as between principal and agent, took effect from the time when it was delivered in due course of mail at the usual place of business and address of the agent. The letter was addressed to Negaunee, the residence of Pellow, and was duly received at his office, where it lay unopened until his return, November 28, 1896, from a trip to Canada. Rees was unadvised of any change in his address, or of his absence from his residence, and in good faith addressed and mailed his letter of revocation to his only known and usual address. If Pellow neglected to notify Rees of his absence and changed address, or to make any arrangement to have his mail forwarded, he cannot escape the consequences of his own fault. Undoubtedly, the general rule is that a revocation only takes effect, as between principal and agent, when it is made known to him. But we are of opinion that, under the facts of this case, he received constructive notice that his agency had terminated. The case is not embarrassed by any acts or conduct of Pellow done in furtherance of his agency between the date when he ought to have received this letter in due course of mail and his actual knowledge of revocation, November 28, 1896. In that interval he did nothing under his authority, and no third person acquired any rights in ignorance of the revocation. The sale subse-

quently made was made by Rees alone, though made to Corrigan, McKinney & Co., with whom Pellow had commenced negotiations immediately upon his employment as agent. Inasmuch as Pellow did not consummate a sale before his authority was revoked, it is clear that he cannot recover upon the theory that he had made a sale of the property, unless that revocation was in bad faith, and the sale subsequently consummated one which was effected through his agency as the procuring cause. The contract between Rees and Pellow was a peculiar one. Pellow's compensation depended entirely upon his being able to make a sale at a price in excess of two dollars per share. If he sold at that price, he would receive no compensation, no matter how valuable his services, nor how large his expenditures. He was to be compensated by receiving for his services all he should receive over the fixed price at which Rees obligated himself to sell the stock through or to Pellow. It is clear, therefore, that unless Pellow was prevented from consummating a negotiation, which was evidently approaching success, by a revocation made for the purpose of defeating his commissions, and taking advantage of his services without compensation, there can be no recovery. Did Rees capriciously defeat a sale about to be made by Pellow for the purpose of availing himself of his services, and avoiding the payment of the agreed compensation? The evidence establishes the fact that Pellow began negotiations for a sale to Corrigan, McKinney & Co., and that he diligently prosecuted his efforts to bring the minds of seller and buyer together down to the conclusion of the conference between Rees and Corrigan at Cleveland in September. The evidence is also satisfactory that in the Cleveland conferences Pellow, though not personally present and assisting, was represented by his kinsman, Mitchell. Pellow had offered the stock at $2.50 per share, a price which would have secured to him a profit of 50 cents on each share if a sale could have then been consummated, subject to a deduction of 25 cents per share under the modification made in favor of Rees. The minds of the parties were not brought together at Cleveland. The option contract contemplated a sale for cash. A purchaser ready and willing to buy upon a credit, not satisfactory to his principal, was not a fulfillment of his obligation. Rees was willing to make some concessions in respect to the terms of payment, but held firmly to the determination to act with Mitchell, and make no sale to which Mitchell, as a large shareholder, should not agree. Mitchell was not willing to make as full a concession as Rees seems to have been. The proposed purchasers were either unwilling or unable to make such cash payment, or otherwise secure deferred payments, as was satisfactory to either Mitchell or Rees. The Cleveland conferences, therefore, ended without any meeting of minds. From that time Pellow ceased to be a factor in the matter. He went off to Canada, and remained until late in November, and apparently abandoned all further efforts to make a sale. After that Mitchell acted only for himself, and there is not the slightest evidence that he at any other time or occasion, save during the Cleveland conferences, acted for or represented Pellow as the agent for Rees in making a sale of the property. Efforts were at once resumed to obtain a con-

cession from the lessors of the Blue Iron Mining Company in respect to royalty upon ore taken from the company's mines. Efforts were also made to secure a supply of coal before winter set in, by which active mining might be resumed. The correspondence between Rees and Mitchell which followed the conclusion of the Cleveland conferences tends to show that Rees was reluctant to abandon the idea of a sale to Corrigan, McKinney & Co., and that he, from time to time, resumed his negotiations with them, and endeavored to obtain some agreement from Mitchell in respect to a cash payment which would enable him to press that firm up to the point of buying by meeting their wishes in respect to terms of payment. Mitchell, on the other hand, was much more disposed to hold firmly for a considerable cash payment, and as the prospect of obtaining a concession in the matter of royalty increased he stiffened in his ideas of the value of the stock. So, also, as the prospect of the elevation of William McKinley to the presidency of the United States increased, both Mitchell and Rees deemed the prospect of an advance in iron to improve, until finally Mitchell, upon his confidence in the improved business conditions of the country, raised his price to three dollars per share, and wired Rees to hold firmly for that advance. On November 6, 1896, the circumstances affecting the value of the subject-matter of this agency had so changed as that neither Mitchell nor Rees was longer willing to part with stock at less than three dollars per share. In this changed condition of things, Rees revoked his option to Pellow. That at that time Corrigan, McKinney & Co. had not accepted the terms upon which Pellow had offered them this stock is not disputed. Those terms were two and one-half dollars per share; one dollar per share to be paid in cash, and the remainder on time, secured by the stock as a collateral. The price had been satisfactory, but the parties could not agree upon the terms of payment, and this was the situation down to the middle of November. Being at liberty to advance the price, Rees did so by demanding three dollars per share. The terms of payment being also made acceptable, a bargain was struck, and a sale made November 24, 1896.

The duty which a broker employed to make a sale assumes is that of bringing the minds of the buyer and the seller together for a sale. This includes the price and the terms of sale. When this has been done he has earned his commission, for his contract has been performed. McGavock v. Woodlief, 20 How. 221; Kock v. Emmerling, 22 How. 69. There is no possible doubt, upon the evidence in this case, that Pellow never did bring the buyers and sellers to an agreement. They were utterly unable to agree upon the terms of the sale, though not differing as to the price. This was the indisputable condition of the matter when the Cleveland conferences ended, and this was the equally indisputable situation on the 6th day of November, when his authority was revoked, although negotiations had been resumed by Rees between those dates. The efforts of Pellow had been unsuccessful. He had been unable to procure a purchaser upon terms acceptable to himself and to both the buyer and seller. Down to the date of the revocation the seller was at liberty to advance the price upon Corrigan, McKinney & Co., for the latter had not accepted

the terms which Pellow had been authorized to offer. At that date the circumstances affecting the value of the stock had changed. Rees was not under any moral or legal obligation to abide longer by his proposition to Pellow, and was at full liberty to revoke his option. There was no sufficient evidence of want of good faith in then revoking his agency to justify the submission of this question to the jury.

For much the same considerations we think it was error to submit the question to the jury as to the reasonable value of Pellow's services. The agreement of August 5, 1896, was not the ordinary brokerage contract between principal and agent. It was an option for a sale, in conjunction with Mitchell, to Pellow himself, or to one designated by him, at a fixed price. Pellow's compensation depended upon his making a sale at something in excess of the fixed price stipulated in the option. No matter how valuable his services, he expressly stipulated that his compensation should depend entirely upon a sale, while the option was in force, for a price in excess of two dollars per share. He made no such sale before the revocation, and there was no evidence, as we have already seen, of a sufficiently substantial character to require that the court should submit to the jury the question as to whether Rees acted in good faith in revoking his authority on the 6th of November. Unless there was evidence which would have reasonably justified a jury in finding that, when the authority was revoked, a negotiation instituted by Pellow was plainly and obviously approaching success, and that Rees, with a knowledge of this, revoked his authority for the purpose of concluding the sale without his assistance, and of avoiding the payment to him of the price obtained in excess of the price fixed in the option agreement, there was no case for the jury at all. If the revocation was in bad faith, it might well be said that the due performance of his obligation was prevented for the purpose of concluding the sale himself, and saving the stipulated compensation. In this event the principal would not be permitted to rely upon the defense that the broker had not performed his contract, in order to defeat a recovery of the stipulated commissions. But if, on the other hand, Rees acted in good faith, not intending to escape the payment of commissions, but moved only by the changed circumstances, and in his own interest, and while the negotiations were unsuccessful or inconclusive, he had the absolute right to terminate the option. After such a revocation he was at perfect liberty to resume or continue efforts to sell to a customer who had been unsuccessfully approached by Pellow, even though he, to some extent, availed himself of the former unsuccessful labors of Pellow. The case of Sibbald v. Iron Co., 83 N. Y. 378–384, and the case of Wylie v. Bank, 61 N. Y. 415, are well-considered cases supporting the view we have expressed, and meet our approval. The case of Stitt v. Huidekopers, 17 Wall. 384, is also much in point in its facts, and lends support to the conclusion we reach as to the right of revocation in good faith of an option much like that here considered. It is true that that case did not involve the question presented here by the count upon a quantum meruit, and turned alone upon the count for commissions under the contract. But our view is that,

under an option such as that here involved there can be no recovery for services unless the authority was revoked in bad faith, and that in that event the recovery would be under the contract for the full stipulated compensation, the principal not being suffered to rely upon a nonperformance, due to his own wrongful interference for the purpose of making the sale himself and avoiding the agreed commission. Pellow had had from August 5th to November 6th to consummate a sale. From October 1st to the latter date he was out of the country, and engaged in no effort whatever. Mitchell, who was his kinsman and friend, and who had acted for him at Cleveland conferences, did not act for or represent him thereafter, but, upon the contrary, says he felt entirely free to act for himself, and in his own interest. Neither can we construe the modification secured by Rees in respect to Pellow's compensation as operating to make Rees his continued agent and representative in further efforts to bring about a sale after the failure of the anticipated sale at Cleveland. That modification was intended to apply to the then anticipated sale,—a sale which, if made, would be due, as Rees then claimed, to certain outside concessions and promises made by him. It did not operate to make Rees Pellow's agent for the subsequent sale of his own stock for Pellow's benefit. Our conclusion is that the sole and only ground upon which defendant in error could recover compensation was upon the ground that his agency to sell had been revoked in bad faith, and as a mere device to defeat Pellow's interest in a sale about to be made. That failing, there should have been a direction to find for the plaintiff in error.

The court erred in submitting to the jury the question of the reasonable value of the services of the defendant, and in the terms of the charge heretofore set out, and in refusing to charge, as requested, that there could be no recovery, upon the facts of the case, under the quantum meruit count of the declaration. The judgment must be reversed, and a new trial awarded.