HOLLWEG v. SCHAEFER BROKERAGE CO.

(Circuit Court of Appeals, Sixth Circuit. July 15, 1912.)

No. 2,206.

1. FRAUDS, STATUTE OF (§ 159*)—EMPLOYMENT CONTRACT—TERM.

Plaintiff alleged the making of a brokerage contract February 4, 1909, to sell glass jars in Toledo territory for the season of 1910, and then charged that this contract was modified and enlarged by agreement on October 1, 1909, whereby plaintiff was given the right to sell during the 1910 season not less than 250 cars in Ohio outside of certain cities and 50 cars in Detroit. It was admitted that the season did not regularly open, and was not expected to open until the latter part of 1909, and that it would continue until October, 1910. Plaintiff sold some of the jars, when defendant prevented him from performing the contract by selling his business to a competitor. Held, that the court properly charged that a valid contract would be established in case the jury found that what was said November 1, 1909, "when the limits of sale and territory in which the sales were to be made were defined, was said by the parties, speaking with the full recollection and understanding of all these previous negotiations and with the intention that those negotiations should enter into the agreement made that day as part of the contract then concluded," and that the contract of employment was not void as a matter of law within the statute of frauds as an oral contract of employment for more than a year.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 378; Dec. Dig. § 159.*]

2. APPEAL AND ERROR (§ 231*)—OBJECTIONS TO EVIDENCE—GROUND OF OBJECTION.

An objection to the admission of evidence cannot be reviewed, where it does not appear that the ground of objection was specified in the trial court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1299, 1352; Dec. Dig. § 231.*]

3. APPEAL AND ERROR (§ 1053*)—REVIEW—EVIDENCE—PREJUDICE.

Where in an action for breach of a brokerage contract to sell Owens process fruit jars the court submitted the case on the theory that plaintiff could only recover in case an oral contract of employment for more than a year had been modified and reaffirmed within a year, defendant was not prejudiced by evidence as to the part plaintiff took nearly a year before the contract sued on in assisting defendant to purchase the rights to the Owens process.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4178–4184; Dec. Dig. § 1053.*]

4. BROKERS (§ 11*)—BROKERAGE CONTRACT—BREACH—VARIANCE.

In an action for breach of a broker's contract of employment, proof of a contract made in April, and modified and enlarged in November of that year, under an allegation of a contract made in February, and modified in October, did not show a fatal variance.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 58; Dec. Dig. § 11.*]

5. CONTRACTS (§ 10*)—EMPLOYMENT CONTRACT—MUTUALITY.

In an action for breach of a broker's contract to sell Owens process fruit jars, plaintiff testified that in conversation with defendant's manager he asked how many cars defendant would be willing to assign to the territory plaintiff was to have, and was informed that defendant would set aside 250 cars for Ohio and 50 cars for Michigan or Detroit,

to which plaintiff replied, "They are sold," and, being asked whether he was sure, stated that he was, that in conversations with jobbers he knew that amount could be sold, and would say to defendant's manager that "they were sold," to which the latter replied that they would be furnished. *Held*, that such statement by plaintiff was susceptible of an interpretation that he undertook to sell the number of cars referred to, and that the contract was therefore not void for want of mutuality.

[Ed. Note.—For other cases, see. Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10.*

Mutuality in contracts, see note to American Cotton Oil Co. v. Kirk, 15 C. C. A. 543.]

**6.** BROKERS (§ 10*)—CONTRACT—RIGHT TO TERMINATE.

Where a contract for broker's services in the sale of fruit jars was not the ordinary brokerage contract without consideration and without term, but was a special contract on consideration for a definite term by which defendant agreed to furnish plaintiff for sale in a definite territory a specified number of fruit jars, such contract was not terminable at the will of either party.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 11; Dec. Dig. § 10.*]

**7.** BROKERS (§ 11*)—CONTRACT OF EMPLOYMENT—BREACH.

Where a broker's contract of employment to sell a definite number of fruit jars for defendant in a specified territory within a specified time was based on a sufficient consideration, it could not be said as a matter of law that defendant's sale of his plant thereby disabling him from performing the contract did not constitute a breach of the contract with plaintiff so as to preclude submission to the jury of the question whether it was fairly within the contemplation of the parties that the relationship should be terminated by a sale of defendant's plant, in which event plaintiff could not recover.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 58; Dec. Dig. § 11.*]

**8.** BROKERS (§ 11*)—EMPLOYMENT CONTRACT—BREACH—DEFENSES.

Where defendant for a consideration employed plaintiff to sell a specified number of fruit jars in a particular territory under specified terms, the fact that all contracts to be taken by plaintiff were subject to defendant's acceptance, and that it was also recognized that during a portion of the season a competitor's price might be so low that defendant would not meet it, and for these reasons defendant in good faith might have rendered plaintiff's contract of no value had he continued in business and declined to meet the prices of his competitors, did not warrant a finding that no enforceable contract existed at any time, or that defendant could, without liability therefor, effectually disable himself from performing the contract, and from passing in good faith on the contract for sales which plaintiff should present for approval by selling his plant to such competitor.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 58; Dec. Dig. § 11.*]

**9.** BROKERS (§ 11*)—CONTRACT—BREACH—LOSS OF PROFITS.

Where a broker of much experience in the sale of glass jars in specified territory, after assisting defendant to obtain the right to manufacture a superior jar by patented process, contracted to sell a certain number of jars for defendant, whose business had been previously successful, within a specified season, subject to defendant's right to pass on contracts obtained and to refuse to meet competitor's prices, the situation being favorable and it appearing that plaintiff was justified in believing that he could sell the jars contracted for, the court could not say that his chances of making sales and obtaining resulting profits were too conjectural to form the basis of recovery, but the burden was on defendant

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to show that conditions were such as to make plaintiff's contract practically meaningless or valueless.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 58; Dec. Dig. § 11.*]

**10.** BROKERS (§ 11*)—CONTRACT—BREACH.

In an action for breach of a broker's contract to sell 300 car loads of fruit jars by reason of defendant's selling his plant, plaintiff was not bound to prove expressly and affirmatively that it could have sold the entire amount contemplated, but it was sufficient that the evidence tended to show that the full quantity might have been sold.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 58; Dec. Dig. § 11.*]

**11.** DAMAGES (§ 6*)—RIGHT TO RECOVER—CERTAINTY.

Only actual damages established by proof of facts from which they may be rationally inferred with reasonable certainty are recoverable.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 5; Dec. Dig. § 6.*]

**12.** BROKERS (§ 11*)—CONTRACT—BREACH—LOSS OF PROFITS.

In an action for breach of a broker's contract for the sale of patented fruit jars, plaintiff was entitled to recover such profits as were probable and reasonably certain to come to him, the extent of which was proved with reasonable certainty, in case he had been permitted to carry on the work, less the reasonable cost of selling the goods.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 58; Dec. Dig. § 11.*]

**13.** BROKERS (§ 11*)—BREACH OF EMPLOYMENT CONTRACT—PROFITS—EVIDENCE.

In an action for breach of a broker's contract of employment to sell fruit jars, evidence of probable sales that plaintiff would have made had the contract not been breached was admissible.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 58; Dec. Dig. § 11.*]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Action by the Schaefer Brokerage Company against Louis Hollweg. Judgment for plaintiff, and defendant brings error. Affirmed.

Charles A. Schmettau and Lloyd T. Williams, both of Toledo, Ohio (Brown, Geddes, Schmettau & Williams, of Toledo, Ohio, on the brief), for plaintiff in error.

Alexander L. Smith, of Toledo, Ohio (Smith & Beckwith, of Toledo, Ohio, on the brief), for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. The defendant in error (who was plaintiff below) recovered verdict and judgment against plaintiff in error for $6,451.60 as damages for the breach of an alleged brokerage contract for the selling of fruit jars. The facts necessary to be stated at this time are these:

Plaintiff in error (hereafter called defendant) was engaged in the manufacture of glass fruit jars at Greenfield, Ind., under the name of "Greenfield Fruit Jar & Bottle Company." Plaintiff was a corporation engaged in merchandise brokerage, with office at Toledo, Ohio; Wil-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

liam H. Schaefer being its president and active representative. Defendant's principal competitors were the Hazel-Atlas Glass Company and Ball Bros. Glass Manufacturing Company (referred to in the record as "Ball"); the latter company apparently controlling the market in large part. Plaintiff had represented defendant as his selling agent during the years 1908 and 1909; the territory being confined to Toledo. During this period plaintiff and defendant were attracted by the so-called "Owens process," by which fruit jars were manufactured entirely by machinery and without hand work. The result was that the defendant obtained the right to manufacture jars by the Owens process, beginning with the season of 1910, which would naturally open in October or November of that year. Plaintiff was specially enthusiastic over the advantages and attractiveness of the Owens process, and the testimony tends to show that it was to a considerable extent through his influence and enthusiasm that defendant decided to acquire the right to use that process. On February, 4, 1909, defendant made plaintiff a proposition for the selling of jars in Toledo upon certain brokerage commissions and premiums, the idea being that out of the premiums plaintiff should reimburse itself for any concessions required to be made from defendant's general prices. No premiums were to be paid when the price of quart jars should be less than $3.75 per gross. Plaintiff criticised this proposition principally because no term was provided, and urged a five-year contract. Plaintiff also urged that it be given additional territory. Defendant was unwilling to make a five-year contract, but in April agreed that the February proposition should stand from year to year. Plaintiff agreed to this, and "started to work on that basis" for the 1910 season, in a campaign of advertising and interesting retailers in the new jars. About September 25, 1909, Detroit was added to the Toledo territory. In the early part of October an arrangement was made with plaintiff to try to sell some of the new jars for 1910 delivery at a price of $3.75 per gross, contracts being taken in plaintiff's name (to avoid Ball's cutting prices); the price being guaranteed against both Ball and the Hazel-Atlas Company's opening prices, the customers being at liberty to cancel their contracts and take competitor's jars in case the latter's price should be lower than defendant would meet. Afterwards, and during October, plaintiff sold 32 car loads, partly in Detroit and partly to Ohio customers. No sales were made after October 11th, at which time the special price was withdrawn. On November 1, 1910, Schaefer was called to defendant's factory to discuss the opening price for the season of 1910. The result of this conference was that plaintiff was given, in addition to the Detroit territory, all of Ohio except Cleveland, Cincinnati, and Columbus; defendant agreeing to set aside 250 cars for Ohio and 50 cars for Detroit. A special opening selling price of $3.75 per gross was agreed upon, contracts to be made upon a special form, with a guaranty of price, terms, and conditions, against both Ball and the Hazel-Atlas Company, with substantially the same provisions for cancellation by customers as contained in Schaefer's contracts with customers before referred to, in case competitors' prices should be less than stated in

the contract and lower than defendant cared to meet. Such contracts were to be "submitted to the factory for acceptance." Plaintiff immediately went to work under this arrangement, interviewing customers as well as local brokers of the defendant, and substituting contracts on the new form for the contracts previously made in plaintiff's name with certain of the customers. On November 5th defendant, by telegram to plaintiff, withdrew the special price of $3.75 per gross. The special price withdrawal was not regarded as a termination of plaintiff's relations with defendant. On the contrary, Schaefer continued at work advertising the jars with the retail trade, all with the knowledge and approval of the defendant. Plaintiff seems to have thought that the withdrawal of the special price was due to the danger of overselling. The parties corresponded from time to time with reference to a meeting for discussing the subject of reopening prices and what should be done with customers who had bought jars and wanted more at the same price. The meeting was put off from time to time to suit defendant's convenience, and finally was set for December 1st, on which date plaintiff learned, through the public press, of the selling by defendant of his plant to Ball, including the right to manufacture under the Owens process. The sale to Ball appears to have been made in November; the precise date not being given. Ball took over from defendant the contracts for the 32 cars sold by plaintiff. November 25, 1910, Ball rendered Schaefer a statement covering brokerage commissions and premiums on the 32 cars. Plaintiff paid no attention to this communication. At the close of the testimony for plaintiff (defendant having introduced none), the latter's request for directed verdict was denied, and the case submitted to the jury under detailed instructions. The errors assigned relate to the refusal to instruct verdict, the admission of evidence, the charge as given, and requested instructions refused. These assigned errors relate generally to (1) the contention that no valid contract was shown; (2) the proposition that if the contract was valid, no breach of it by defendant was shown; and (3) the measure of damages.

1. The validity of the alleged brokerage contract.

[1] Plaintiff's petition alleges the making of a brokerage contract on or about February 4, 1909, for the Toledo territory and for the season of 1910. It alleges that this contract was modified and enlarged by mutual agreement on or about October 1, 1909, whereby plaintiff was given the right to sell during the season of 1910 not less than 250 car loads in Ohio, outside of Cincinnati, Cleveland, and Columbus, and 50 car loads in Detroit. The scale of commissions and premiums to be paid, and plaintiff's agreement to perform, and his subsequent acts in performance until prevented by defendant's sale of the business, are set out in detail. Defendant insists that the alleged contract was shown to be invalid, first, as contravening the statute of frauds; and, second, for lack of mutuality.

(a) As to the statute of frauds: It is conceded that the alleged contract was for the season of 1910, and that the season would not regularly open, and was not expected to open until the latter part of

1909, and that it would continue until October, 1910. A contract not in writing made before October, 1909, if not fully to be performed until the end of the season of 1910, would be void under section 8621 of the General Code of Ohio, which requires agreements not to be performed within one year from the making thereof to be evidenced by writing; and it is urged by defendant that previous to November 1, 1909, there was no sufficiently complete and definite written agreement to satisfy the Ohio statute. If, however, the contract recovered upon is regarded as made November 1, 1909, it was not within the statute. The case was submitted to the jury upon the theory that there was no valid contract until the conversation of November 1st, at which time the agreement was made to extend the terms of the brokerage contract to the remainder of Ohio outside of the three cities named, and to assign 250 cars to Ohio and 50 cars to Detroit. The jury was specifically instructed that the previous correspondence relied upon by plaintiff did not create a contract. But the instruction was, in effect, given that a valid contract would be established in case it should be found that what was said November 1, 1909, "when the limits of sale and the territory in which the sales were to be made were defined, was said by the parties, speaking with the full recollection and understanding of all these previous negotiations and with the intention that those previous negotiations should enter into the agreement made that day as parts of a contract which they were at last concluding," provided the contract was mutual or upon a consideration hereafter referred to. These instructions are criticised as overlooking the fact that long before November 1st the parties had reached a full agreement, evidenced in part by the February correspondence, although that contract was void under the statute.

We think the court did not err in submitting the case to the jury upon the theory stated. If the court was mistaken in saying that the parties had not agreed upon a contract previous to November 1st, it is difficult to see how defendant was prejudiced thereby, in view of his contention that no valid contract was actually made. We know of no principle making it incompetent for parties who have made an agreement unenforceable under the statute of frauds, because not to be performed within one year from its making, afterwards, and at a time when the statute of frauds would not apply, orally to modify and enlarge their former agreement, and to renew it as so enlarged and modified. We see nothing in this proposition in conflict with the rule stated in cases like Haslam v. Barge, 69 Neb. 644, 96 N. W. 245, and Booker v. Heffner, 95 App. Div. 84, 88 N. Y. Supp. 499, that an unwritten contract, by its terms not to be performed within a year from its making, is not taken out of the statute by an oral acknowledgement within a year from the date of performance. Nor does the rule we have stated conflict with the proposition asserted in Swain v. Seamens, 9. Wall. 254, 272, 19 L. Ed. 554, and Lawyer v. Post, 109 Fed. 512, 513, 47 C. C. A. 491, that a written contract falling within the statute of frauds cannot be varied by any subsequent agreement of the parties, unless such new agreement is also in writing. The theory on which the question we are considering, was submitted to

the jury treated the contract of November 1st as of no more effect than if wholly oral. We think the evidence fairly tended to support the theory under which, as we construe the charge, the question was submitted to the jury.

[2] In this connection it is urged that error was committed in permitting Schaefer to testify as to the part he took nearly a year before the making of the contract sued upon in assisting defendant respecting the purchase of the rights to the Owens process. Counsel say this testimony could have no bearing upon the issues, and that its sole purpose and effect must have been to unduly impress the jury with the importance of plaintiff's relations with defendant. It should be enough to say that, while this testimony was objected to, the ground of the objection nowhere appears, and there is nothing in the record to indicate that any intimation was given the trial court of the nature of the objection urged in this court.

[3] We may add, however, that, having in mind the theory on which the case was submitted to the jury, we cannot see that prejudice could have resulted from this testimony.

[4] By a requested charge, which was refused, variance was urged between the petition and the proofs, in that the former alleged a contract made in February and modified in October, while the latter tended to establish a contract made in April and modified and enlarged in November. We think there is no merit in the objection of variance.

[5] (b) As to mutuality: The jury was instructed that to render the alleged agreement of November 1st enforceable—

"either those negotiations must bear the reasonable interpretation that the plaintiff undertook to and did bind himself to sell 250 car loads of jars in Ohio and 50 cars of jars in Detroit, or that the defendant in making this proposition intended to avail itself, as a consideration therefor, of the efforts in pushing its wares and working up a market for its wares within these territories, already then performed to its knowledge by the plaintiff."

Defendant requested an instruction (which was refused) that the contract established by the proofs did not require the defendant to furnish to the plaintiff the car loads in question for sale in either the Ohio or Detroit territory, or any certain number of cars during the 1910 season or any other stated period. The correctness of this instruction and of the refusal to instruct, so far as the question of mutuality is involved, depends upon the interpretation of the conversation between Schaefer and defendant's manager. Schaefer testified:

"I said, 'How many cars would you be willing to assign to that territory?' 'Well,' he said, 'we will be willing to set aside 250 cars for Ohio and 50 for Michigan or Detroit, properly speaking.' I said, 'They are sold.' He said, 'Are you sure of that?' I said, 'Yes; in my travels through the state for the last two or three months I am satisfied from conversations with jobbers that that amount of jars can be sold, and I will say to you that they are sold.' He said, 'We will have them for you.'"

Defendant contends that Schaefer's words cannot be construed as an undertaking to sell the cars referred to, but "are merely an emphatic assertion of his confidence in his ability to sell." In view, however, of Schaefer's testimony as to what he did or did not do by way

of interviewing the trade, including his great enthusiasm and his confidence in the selling qualities of the Owens jar, we cannot say, as a matter of law, that the testimony would not sustain an interpretation of Schaefer's words as amounting to an agreement to make the sales in question. The jury may well have thought it reasonable that Schaefer's very enthusiasm and confidence would prompt him to make a positive undertaking to sell the amount set aside for him. The fact that plaintiff's orders were subject to defendant's rejection does not necessarily preclude the idea of a definite undertaking by plaintiff to sell. It was not to be assumed that orders would be arbitrarily refused; but, to the extent to which defendant refused to accept orders, plaintiff would, of course, be relieved of his undertaking. ·

The criticism of the instruction that plaintiff's previous efforts in working up the 1910 market might furnish a consideration for the contract of November 1st appears to have been presented for the first time in this court. However, if by reason of the agreement of November 1st defendant gained benefits he would not otherwise have obtained (as, for instance, the sales of the 32 cars actually completed), it would seem too much to say that Schaefer's past services formed no consideration for the new agreement.

2. Was the alleged contract terminable at the will of defendant?

[6] Defendant's counsel contend that the case presents the ordinary contract of brokerage, without definite term, and that such contracts are terminable at any time, at the will of either party, in good faith. The authorities cited support this general proposition of law.[1] There is no room for the suggestion that defendant's sale of its business was in bad faith within the meaning of the rule just stated; that is to say, that it was made for the purpose of defeating plaintiff's contract rights. And we may here add that no possible theory of recovery because of plaintiff's alleged connection with the procuring by defendant of the right to the Owens process, or because of defendant's alleged "playing fast and loose" with plaintiff in the negotiations for and in operations under the contract in question, or, as otherwise stated, of the alleged use of the contract and plaintiff's services thereunder as, a means of inducing Ball to purchase defendant's plant, can be the subject of consideration here. No such theory was submitted to the jury or embraced in plaintiff's petition. The case must be considered here as it was considered below, as one for the recovery of damages actually suffered by the actual breach of a contract actually made. It is obvious, however, that neither the authorities referred to nor those relating to the ordinary contract of real estate brokerage, are necessarily decisive of the present controversy. By the contract here alleged, and necessarily found by the jury, defendant undertook, upon a sufficient consideration, to furnish plaintiff for sale in a definite territory, during a definite season, a definitely limited number of jars. It was upon such basis alone that recovery was permitted below. If

[1] Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 384, 38 Am. Rep. 441; Rees v. Pellow (C. C. A. 6) 97 Fed. 167, 172, 38 C. C. A. 94; Sheahan v. National S. S. Co. (C. C. A. 2) 87 Fed. 167, 30 C. C. A. 593.

the evidence sustains the alleged contract, we have before us not the ordinary brokerage contract, without consideration and without term, but a special contract, upon consideration and for a definite term, so far as needed for the sale of the jars appropriated for the purpose. Such contracts are not ordinarily terminable at will without liability therefor. Defendant insists, however, that, even if the contract were ordinarily enforceable, the sale by defendant of its plant was not a breach of the contract, for the reason that the contract must be construed as "simply a contract by the principal to sell such goods as he sees fit to sell within the territory assigned to the broker, through the broker, and not through any other agent." Several authorities are cited which, as applied to the facts in the cases there presented, announce the proposition stated.[2] In Rhodes v. Forwood the agreement was that for a given term of years plaintiff should be the sole agent at Liverpool for the sale of defendant's coal, and that the latter would not employ any other agent at Liverpool for that purpose. Before the end of the term defendant sold his colliery. Plaintiff was denied right to damages on the ground that the agreement did not bind defendant to keep his colliery or to do more than to employ plaintiff in the sale of such coal as he should send to Liverpool. As said by the Lord Chancellor:

"There is no express term in the contract from beginning to end that the appellant, the colliery owner, would send any coal to Liverpool, or any particular quantity of coal to Liverpool, or that he would continue for any particular length of time to send coal to Liverpool."

And again:

"The agents could not have demurred or complained if every ton of this coal raised during the seven years at the Risca colliery had been sold at Swansea, or at Southampton, or at any other port which might be suggested."

And this consideration seems to underlie the conclusion reached. In Ex parte Maclure plaintiff agreed with an insurance company to act as its agent for a term of years and to transact no business except for that company, in consideration of which he was to receive a fixed salary and also a commission on all business transacted. Before the end of the term the insurance company was wound up voluntarily. The agent was permitted to recover his fixed salary during the unexpired term, but was not allowed to prove the loss of his commissions during the remainder of the term. The Lord Justice treated the contract as providing a commission in order to give "an inducement to carry on the business effectually, properly and prudently," saying:

"It was never intended to give the servant the right of dictating as to the extent of the business, whether more or less, or nothing, but he simply took the chance of the company finding it a profitable business and carrying it on. The company had the right to reduce the business to a minimum; and, if they had a right to reduce it to a minimum, they had a right to reduce it to nothing—so far as he was concerned."

---

[2] Rhodes v Forwood, L. R., 1 App. Cas. 256; In re English & Scottish Marine Ins. Co. (Ex parte Maclure) L. R., 5 Ch. App. 737; Burton v. Great Northern Ry. Co., 9 Exch. Rep. 507; Pellet v. Manufacturers' & Merchants' Ins. Co. (C. C. A. 7) 104 Fed. 502, 43 C. C. A. 669.

In Burton v. Great Northern Ry. Co., plaintiff agreed with the railway company to convey between two named places all merchandise that might be presented to him for that purpose, and to provide conveyances and horses necessary for the purpose. It was mutually agreed that the contract should continue for a given term. Before its expiration the railway company sold a portion of its line to another railway company and bound itself not to carry between the two points referred to, and so failed to present further goods to the plaintiff for carriage. Defendant's obligation seems to have been treated as one to pay for the carriage of such goods as should be presented to the plaintiff, and, as none were presented, it was held there was no breach of contract. In Pellet v. Insurance Co., as stated in the headnote:

"Defendant, an insurance company, contracted with plaintiffs to conduct a general insurance agency, constituting plaintiffs its general agents to have charge of all its business in certain states for a term of three years."

Before the expiration of the term, defendant discontinued its business. In an action upon the contract for damages, a judgment for defendant upon directed verdict was affirmed. Judge Grosscup, in his opinion, used this language:

"Unless, therefore, the contracts, either expressly or by implication, bound the defendant in error, throughout the period of the contracts, to the continued acceptance of such business as the plaintiffs in error might bring, irrespective of its own judgment upon the policy of diminishing or ceasing altogether such business, there exists no promise upon which the action can be predicated. * * * It might well happen that out of some consideration relating to its own policy the company might choose to materially abridge its business within, or withdraw altogether from, the territory named. The laws of a state may become burdensome; the character of risk in a given district may change; a wise adjustment of its affairs may require a change of field of operations, or an entire liquidation of its business. Was it contemplated, in the execution of these agreements, that the judgment of the company upon these questions should be surrendered to the interests of the agents; at least that it could not act upon such judgment without continuing to compensate the agents, as if no such action had been taken? We think the agreements will bear no such interpretation."

Judge Seamans forbore to pass upon the question whether the fact of the transfer of the business constituted a breach of the contract. Judge Woods merely concurred in the result reached.

On the other hand, in Lewis v. Atlas Mutual Life Ins. Co., 61 Mo. 534, it was held that the inability of a corporation to continue in business is no excuse for its breach of contract with an agent. In Macgregor v. Union Life Ins. Co. (C. C. A. 8) 121 Fed. 493, 57 C. C. A. 613, it was held as stated in the headnote:

"A life insurance company which abandons its business by transferring it to another company, and thus disables itself from carrying out a contract by which it appointed a general agent or manager, and refuses to permit him to continue in such capacity, is liable for damages for breach of such contract, where, either by its terms or by implication, the agency was to continue for a certain term."

Judge Thayer, in the course of his opinion, said:

"It is also well settled that whatever may be fairly implied from the express provisions of an agreement is as binding and obligatory upon the parties thereto as that which is in terms expressed."

And again:

"The general doctrine which is invoked by counsel for the defendant company, that a principal is entitled to revoke the authority of an agent at any time, when there is no express or implied agreement between them that the agent shall be retained for a definite period, is not denied; but in the case in hand we are of opinion, for the reasons already stated, that there was an implied agreement between the contracting parties that the agency here involved should continue for the period of five years, unless it was terminated by mutual consent, or in one of the ways provided for in the contract."

In Moore v. Security Trust & Life Ins. Co. (C. C. A. 8) 168 Fed. 496, 502, 93 C. C. A. 652, 658, where it was held that a contract by a life insurance company which turned over its property and business to a rival company, thus incapacitating itself to continue its insurance business, was not a breach of contract of appointment of agents which contained no agreement fixing the time such appointment should continue, Judge Sanborn said:

"This conclusion is not necessarily inconsistent with the position that, where an insurance company makes an express agreement to employ an agent for a specific term and to pay his commissions during that term upon the business he secures, it breaks the agreement and subjects itself to all the damages which naturally flow from that breach by transferring its property to another and abandoning its business during the agreed term, as in MacGregor v. Union Life Ins. Co., 121 Fed. 493 [57 C. C. A. 613], * * * and Lewis v. Insurance Co., 61 Mo. 534, 539, or radically changes the nature of its business during the term, as in Newcomb v. Imperial Life Ins. Co. (C. C.) 51 Fed. 725, 727, 728, and Id., 62 Fed. 97 [10 C. C. A. 288], * * * because an implication that the company will continue its business for the agreed term of the agency *may inhere* in such a *time contract*, while it *does not in a contract of agency at will;* and so far as the opinions in these cases depart from the view already expressed they are not convincing and they fail to commend themselves to our judgment." (Italics ours.)

It will thus be seen that in the cases discussed the question whether the sale of the business constituted a breach of the contract of brokerage was made to turn upon the intention of the parties. In the instant case the trial judge submitted to the jury the question whether the contract included "as one of its terms attached to it by implication * * * that it should be terminated in such a manner as the defendant finally undertook to terminate it," saying that, if "it was fairly within the contemplation of the parties that the relationship then established * * * could be terminated by the sale of the defendant's plant, * * * the plaintiff has no ground for recovery here whatsoever." The trial judge further said that:

"Before you are able to say that such a contingency was fairly within the contemplation of the parties you must find that by a fair inference and deduction from the testimony before you."

[7] Unless for the considerations to which we are about to call attention, we are constrained to the view that there was no error in refusing to hold, as a matter of law, that defendant's sale of his plant constituted no breach of his alleged contract with plaintiff; nor in submitting to the jury the question whether the contingency of such sale was fairly within the contemplation of the parties.

[8] The further considerations to which we have just alluded are these: First, all contracts for sale to be taken by plaintiff were to be subject to the acceptance of defendant, as expressed by the condition printed upon the forms provided therefor; second, it was recognized that Ball's price might, during a portion at least of the season, be so low that defendant would not meet it, and Schaefer testified, with reference to a conversation previous to October 1, 1909, that:

"At that time we both thought that the price of Ball might be as low as $3.25, and that price, Mr. Lloyd (defendant's manager) said, the Greenfield (defendant) would not meet."

And counsel say that defendant "could at any time, by refusing to meet its competitor's prices, render it impossible for the Schaefer Company to make sales in its territory up to the number of carloads which it is alleged the Greenfield Company had agreed to furnish the Schaefer Company to sell," and that the defendant thus reserved to itself a complete control over the sales of its product in the territory assigned to the defendant.

Does it follow from the fact that defendant, had he continued in business, might have made the contract valueless to plaintiff by declining in good faith to meet the prices of his competitors (and bad faith in this regard does not enter into the present problem), that no enforceable contract existed at any time, or that defendant could, without liability therefor, effectually, and presumably for his own advantage, disable himself from performing his contract and from passing in good faith upon the contracts for sales which plaintiff should present for approval? It seems to us that this question compels a negative answer. This case was tried after the close of the 1910 season.

[9] It was, of course, open to defendant to show that conditions were such, or but for the sale of defendant's business would have been such, that plaintiff's contract would be worthless to it. But we should be doing violence to the record, including the testimony of the attractiveness, popularity, and greater efficiency of the Owens jar, the prospects for a successful season of 1910, and the fact of the purchase by defendant's competitor (early in that season), of defendant's business, including the right to make the Owens jar (a sale not improbably induced by the prospects of defendant's success), should we assume it otherwise than reasonably natural and probable that but for the sale by defendant of its business plaintiff could have made, with defendant's approval, substantial sales under the contract in question, and could have realized thereby substantial profits. Such would have been the normal and natural result. Such was apparently the result expected by both parties. Defendant's manufacture and sale of glass jars was not an untried experiment. He had been in that business several years. Nor were plaintiff's relations to the business new and untried. He even then was defendant's Toledo representative, and had held that relation not only for the two preceding years, but in earlier years. The situation apparently justified the confidence that the superiority of the Owens process gave defendant substantial ad-

vantages in the market never before possessed. We cannot, under these circumstances, declare as matter of law that plaintiff's chances of making sales and resulting profits were too conjectural to form a basis of recovery. For, in its last analysis, that is, in our opinion, what the objection comes to. We think that under the case as presented the burden was upon defendant to show, if it could, that conditions were such as to make plaintiff's contract practically meaningless or valueless.

[10] We see no merit in the suggestion that plaintiff was barred from recovery for alleged lack of express and affirmative proof that it could have sold the entire 300 carloads contemplated. It is enough to say that, taking into account the enlarged territorial limits accorded to plaintiff by the contract, the extent of territory in Ohio remaining uncanvassed at the time of the breach, and what plaintiff in fact did in the short time devoted to performance, there was testimony tending to show that the full 300 car loads might have been sold. The fact that the jury did not award damages for the loss of sale of the full 300 cars does not conclusively establish that the full amount could not have been sold.

3. The subject of damages:

[11] Defendant complains that plaintiff was allowed to recover damages which in their nature were speculative and uncertain. The general rule is too well settled to require more than the merest reference to authority that only actual damages, established by the proof of facts from which they may be rationally inferred with reasonable certainty, are recoverable.[3] The instructions to the jury recognized and applied this rule.

[12] The court defined the profits recoverable as "probable profits reasonably certain to come to the plaintiff," and the court charged that:

"The evidence must show to this jury with reasonable certainty the extent of such probable profits to the plaintiff, had the plaintiff been permitted to carry on the work. You are not permitted to speculate or guess as to what the amount of those commissions would have been. You must go to the evidence and find in that evidence some basis for an estimate of what they would be."

The general charge as to the necessity of proof of probable sale of the jars was in our opinion fair and proper. Careful instructions were given to the jury by way of limitations to be observed in computations for commissions and premiums. The reasonable cost of selling the goods was required to be deducted from the compensation otherwise accruing. We think the instructions clearly within the well settled rules.[4] In United States v. Behan, at page 344 of 110 U. S., at page 83 of 4 Sup. Ct. (28 L. Ed. 168), it is said that:

[3] Central Coal & Coke Co. v. Hartman (C. C. A. 8) 111 Fed. 96, 49 C. C. A. 244.

[4] United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Wakeman v. Manufacturing Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Wells v. National Life Ass'n (C. C. A. 5) 99 Fed. 222, 39 C. C. A. 476, 53 L. R. A. 33.

· "Profits cannot always be recovered. They may be too remote and speculative in character, and therefore incapable of that clear and direct proof which the law requires. But when, in the language of· Chief Justice Nelson; in the case of Masterson v. Mayor of Brooklyn, 7 Hill [N. Y.] 69 [42 Am. Dec. 38], they are 'the direct and immediate fruits of the contract,' they are free from this objection; they are then 'part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and· plain as to the fulfilment of any other stipulation.' "

[13] Nor was the proof of probable sales open to the criticism of uncertainty and speculation in the legal sense. The evidence tended to show that the Owens jar was received with great favor by the trade; that the prospects of large sales during the season were good. Before the contract was terminated plaintiff had actually sold 32 cars. One of plaintiff's customers afterwards asked for two extra cars. Twelve cars were sold by Ball to jobbers in Toledo after the purchase of defendant's plant. There was evidence tending to show the likelihood of making sales to other named. customers. The jury was instructed, in substance, that it was not limited, in its consideration to sales which would probably be made by defendant, to the consuming capacity of the several firms which had already been interviewed by the plaintiff. This instruction is criticised by defendant, who insists that, if plaintiff had sold every customer it. approached to the extent of the latter's full capacity to handle fruit jars, the sales would have aggregated only 158 cars, the commissions and premiums on which would have amounted to but $4,266. We think, however, in view of the nature of the evidence already referred to, defendant's contention is not well founded, and that the trial court took ·the correct view of the subject. As said by Judge Grover (quoted in Wakeman v. Manufacturing Co., at page 212 of 101 N. Y., at page 268 of 4 N. E. (54 Am. Rep. 676), with respect to the uncertainty of profits:

"It is not an uncertainty as to the value of the benefit or gain to be derived from performance, but an uncertainty or contingency whether such gain or benefit would be derived at all. * * * It is sometimes said that speculative damages cannot be recovered because the amount is uncertain; but such remarks will generally be found applicable to such damages as it is uncertain whether sustained at all from the breach."

. The evidence as to the probable amount of sales was.thus not speculative. The other elements entering into the loss of profits were commissions, premiums, and expenses of sales. The commissions were fixed. The premiums were equally fixed, except as they were subject to be affected by concessions made to meet competitors' prices. It seems to have been conceded that the normal commissions and premiums would average $27 per car, subject to the possible deduction last referred to. While there is no express testimony as to what the expenses of selling jars would have been, the jury were not without guide on this subject. There was proof of plaintiff's expenses from July to December, 1909, in advertising, working up, interviewing and selling the trade. We cannot say that from all the testimony presented the jury were not in position to make a reasonably ·accurate estimate of the net profits lost to plaintiff by the termination of the contract.

Other assignments of error are discussed in defendant's brief. To discuss them here in detail would unnecessarily extend this opinion. We content ourselves with saying that we have considered them all, and are of opinion that the motion for a directed verdict was properly denied, and that no prejudicial error was committed in the trial or submission of the case.

The judgment of the Circuit Court is accordingly affirmed, with costs.