ROSEBOOM et al. v. CORBITT et al.

(Circuit Court of Appeals, Sixth Circuit. May 15, 1912.)

No. 2,215.

1. VENDOR AND PURCHASER (§ 44*)—SUIT BY PURCHASER FOR RESCISSION—EXECUTED CONTRACTS.

To entitle a purchaser to a rescission in equity of a contract for the sale and purchase of land on the ground of fraud, after the contract has been fully executed, proof of the fraud or misrepresentation must be clear and certain, and complainant must have been deceived and injured thereby.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 69–76; Dec. Dig. § 44.*]

2. VENDOR AND PURCHASER (§ 34*)—SUIT BY PURCHASER FOR RESCISSION—GROUNDS.

A shortage of 17½ acres in a tract of land represented by the vendors to contain 373 acres is not sufficient ground for rescission of an executed contract for the sale of the tract for a lump sum; it being described in the deed as containing "373 acres more or less," and in the absence of proof of actual fraud.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 39; Dec. Dig. § 34.*]

3. VENDOR AND PURCHASER (§ 43*)—RIGHT OF PURCHASER TO RESCIND—RATIFICATION.

At the time of the sale of a plantation by defendants to complainants, it was under lease for the current and two succeeding years, and defendants gave complainants their own notes for the amount of the rental which, as they represented, the tenant was to pay. In April of the last year of the lease it was turned over to complainants, and from it they learned that the amount of rent which the tenant contracted to pay was materially less than defendants had represented. *Held*, that the subsequent collection by complainants of the note given by defendants for the rent of that year, covering the time to the end of the year, was an elec-

―――――――――――――――――――――――――――――――――――――――――――――

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion to ratify the purchase and a bar to a subsequent suit to rescind for the misrepresentation.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 67, 68; Dec. Dig. § 43.*]

Appeal from the Circuit Court of the United States for the Western District of Tennessee.

Suit in equity by Jacob A. Roseboom and Helen D. Roseboom against Samuel R. Corbitt and William S. Biles. Decree for defendants, and complainants appeal. Affirmed.

Elias Gates (Lehman, Gates & Martin, on the brief), for appellants.
H. R. Boyd, for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. Complainants filed their bill to rescind their contract of purchase of a tract of land in Coahoma county, Miss., sold to them by defendants. The Circuit Court entered a decree dismissing the bill, and appeal is taken from that decree. The important facts are these:

Complainants are husband and wife, and in 1906 resided at Mattoon, Ill.; Mr. Roseboom being a broom corn broker, and having considerable money for outside investment. Defendants resided at Memphis, Tenn., and were engaged in handling real estate, partly their own and partly for others. They owned the tract in question. May 16, 1906, complainants bought from defendants this tract, known as the "Gold Dust Plantation." The price to be paid was $20,000, of which $5,000 was paid in cash, $8,420.34 by way of assumption of existing liens against the tract, the remaining $6,579.66 being represented by complainants' notes, secured by deed of trust upon the premises bought. The written description of the tract taken from the land agent's books, a copy of which was furnished complainants during the negotiations for purchase, contained the following items, among others:

"Acres No. 373. * * * Acres in cultivation, 225. Acres deadened, No. 148. * * * Rents for three years for $1,600.00 per year."

The premises were at the time under lease given by defendants to one Ross, running from July 18, 1905, to December 31, 1908. By its terms Ross was to have the use of the place for the remainder of the year 1905 without charge, and was to have certain property then on the place. For 1906 he was to pay $900 and for each of the years 1907 and 1908, $1,000. He was to put in cultivation, during the year 1906, 50 acres of land never before cultivated, and to properly deaden, prior to September 1, 1906, all the remainder of the timber, except that no cypress should be cut or deadened without defendants' permission. He was also to do all ditching necessary to be done, to put the place in good condition for cultivation, at a cost of not less than $250. He also agreed that at the expiration of the lease there should have been in cultivation during the year 1908 not less than 225 acres of land, that for any amount remaining uncultivated at that date he was to pay $20 per acre, and for any portion not deadened prior to Sep-

tember 1, 1906, $5 per acre; both these items to be protected by lien upon the crops as if for rent. The lease was not at the time turned over to complainants. Defendants gave the latter their notes for the amount of the rent claimed to be payable by Ross, viz., $1,600.00 for each of the years 1907 and 1908, $1,400 being agreed upon for the unearned portion of 1906. Complainants immediately took possession of the plantation, subject to Ross' tenancy during that period, visiting it several times and making some improvements thereon; paying, as they matured, the different installments of purchase price, including the liens assumed; and collecting from time to time the rent notes given by defendants. In April, 1908, defendants turned over to complainants their lease with Ross. On June 1st, following, complainants paid the last installment of the assumed liens against the land, amounting to $4,079.66, and on the 24th day of the same month discounted at a bank the note of $1,600 given by defendants for the 1908 rent. In the following month they had the plantation surveyed, the survey showing but 355.55 acres in the tract, or a shortage of about 17 acres; a total of 192.87 acres of cleared land (a shortage of about 32 acres from the amount represented); and an uncultivated acreage of 162.69 acres. Complainants on January 1st, following, filed their bill for rescission, upon the ground of false and fraudulent representations, inducing the sale: First, as to the number of acres actually in the tract; second, as to the number of acres actually in cultivation; third, the representation that there were to be placed in cultivation 50 acres additional during the term of the Ross lease; and, fourth, that fraud and deceit were practiced on complainants by defendants in representing that the property was leased to Ross for $1,600 rental for a period of three years. The trial judge was of opinion that the shortage neither in the number of acres stated in the deed nor in the number of acres in cultivation was sufficient to warrant a holding of fraudulent misrepresentation in those regards; and that complainants' conduct in making the payment referred to and in negotiating the rental note after knowledge of the actual terms of the lease, together with the delay in bringing suit to rescind, constituted a ratification of the purchase, notwithstanding defendants' deception regarding the true amount of the yearly rental received from Ross.

[1] 1. In our opinion, the deficiency of 17.44 acres out of a total of 373 acres is not ground for rescinding the contract. The contract sought to be rescinded has been fully executed. As said in Atlantic Delaine Co. v. James, 94 U. S. 207, 214 (24 L. Ed. 112):

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them."

As expressed in Files v. Brown (C. C. A. 8) 124 Fed. 133, 139, 59 C. C. A. 403, 409:

"If there is one proposition in the law regarding the rescinding of contracts and the cancellation of muniments of title that is established beyond doubt or cavil, it is that the complainant must establish the essential facts

of his cause of action with clearness and certainty, to entitle him to any relief."

[2] Complainants testified, it is true, that defendant Corbitt represented that the tract contained 373 acres as shown by a survey made by himself and his associates. Corbitt denies this, and testifies that he merely said there were 373 acres in the tract according to the government survey. It is not clear that the representation went beyond this. The sale was not by the acre, but was in gross. The deed describes the tract as containing "373 acres more or less." The rule is that in such case, in the absence of proof of fraud or misrepresentation, the purchaser takes at his own risk as to the quantity, unless the deficiency be so great as to create a presumption of fraud. Miller v. Bentley, 37 Tenn. 671. The deficiency in question is not so great as to create such presumption. The deficiency, moreover, is not shown to be controlling. There is no reason to suppose, from the record, that knowledge of this comparatively small shortage would have made any difference with the sale. Moreover, as we understand the record, a substantial part of the shortage results from an actual deficiency from estimates shown by government surveys. A deficiency so resulting would not ordinarily be chargeable to the vendor.

2. What has been said respecting the necessity of clearness and certainty in proof of misrepresentation to give right to rescission applies to the alleged misrepresentation regarding the cultivated acreage. It is difficult to determine satisfactorily what representations were actually made upon this subject. Complainants testified that Corbitt represented that 225 acres were under cultivation when the sale was made and that an additional 50 acres was to be put under cultivation during Ross' tenancy. Corbitt denies this, and says that the 50 acres were to be part of the 225 acres to be left by Ross at the end of his tenancy. Ross claims not to have understood that he was to cultivate an additional 50 acres, except as he was to have 225 acres cultivated at the end of his term, and states that he was under the impression that there was the latter amount of cultivated acreage when he went onto the place in 1903. The amount of new land cultivated by Ross is not definitely shown. He says that he cleaned up, planted, and plowed a "great big patch of land" at Roseboom's direction, and that the latter said that if the 225 acres had been all plowed up and cultivated that year he would be satisfied. In view of all the testimony, complainants have not sustained the burden of satisfying us that they had reason to understand that 50 acres were to be put into cultivation in addition to the 225 acres. We think defendants' construction of the representations made quite as consistent with the testimony taken together as is that of complainants, and that we are justified in accepting the view that the deficit in cultivated acreage is due to the default of Ross rather than to misrepresentations by defendants. In our opinion, the proof of misrepresentation regarding the cultivated acreage is not such as to justify a decree of rescission.

[3] 3. There remains to be considered the alleged deception regarding the rental paid by Ross. Complainants testified that Corbitt

represented that Ross was paying $1,600 per year rent. Corbitt insists that he represented only that Ross' rent was paid partly in money, the remainder being paid by way of ditching, deadening, and cultivating, and claims that these items together amounted to $1,-600 a year. The cash rent added to the cost of ditching, deadening, and cultivating of 50 acres new land, if measured by the scale of penalties provided for failure with respect to the last two items, would bring the rental up to $1,600 a year for three years, and according to some of the proof of the value of clearing and deadening introduced by complainants to more than that amount. By the terms of the lease Ross was to have the "feed stuff and groceries" on the plantation, together with the accounts against certain "hands" on the place, and was to carry out the agreement between certain of those "hands" and the defendants. He also had the use of the plantation for the latter part of the year 1905 without charge. Ross testified, without dispute, that there went to him with the leased land in 1905 a considerable crop of growing cotton and corn, and that in return for these crops, together with the feed and supplies (including, presumptively, the use of the plantation), he was to pay the cash rent stated in the lease and do the ditching, deadening and cultivating. The net (as distinguished from gross) value of the crops and personalty which passed to Ross does not definitely appear. We think it a reasonable inference, from all the testimony, that the actual rent paid by Ross was regarded by the parties to the lease as materially more than the cash rental mentioned therein, but as materially less than $1,600 per year. Just where the line should be drawn it is impossible to determine. We must assume, from the testimony, that defendants gave complainants to understand that Ross was actually paying, in money or otherwise, what would amount to $1,600 a year rent. The rental value of the land was material, not only for its bearing upon the ultimate market value of the land, but especially in view of complainants' testimony that Roseboom wanted an 8 per cent. investment, which would be produced by a $1,600 rental, but not by one of less amount. How far controlling this element of rental value may have been is, however, not entirely clear. Mrs. Roseboom, who is an intelligent woman, and took an active part in the purchase of the plantation, seems to have been strongly impressed with the attractiveness of investment in lands in the vicinity of the Gold Dust Plantation, and with the prospect of early advancement in prices. She introduced some of her friends from time to time to defendants, and encouraged those friends to make investments in such lands, receiving from defendants a commission of $1 per acre for her services connected with such sales, including the sale of the plantation in question. She visited and inspected the plantation before its purchase. Complainants apparently expected that the plantation would by the expiration of the Ross lease be worth materially more than $20,000. Whether this expected rise in value and the prospect of substantial profit on this more or less speculative purchase would have been sufficient to induce complainants to make the purchase, even had they known the actual rental paid by Ross, as well as the

other matters of which they now complain, can be the subject of conjecture only, and is not important except as it may perhaps throw some light upon complainants' failure to repudiate the purchase on definitely learning the facts about the Ross rental. The testimony introduced by complainants (defendants having presented none on these subjects) is that the market value was materially less than $20,-000, and the rental value materially less than $1,600. But the testimony on both these subjects is meager and not entirely satisfactory. We are not, however, required to pass more definitely upon these questions, for we think the right to complain of the misrepresentations as to the rental paid by Ross was lost by complainants' action in paying the last of the assumed liens against the land, and in discounting defendants' note for the last year's rental, after knowledge of the contents of the Ross lease.

Mrs. Roseboom had in 1906 information tending to show that the rent paid by Ross was less than $1,600. But we have not taken this information into account as a substantive ground of laches or estoppel, or as putting complainants to an election at that time as to the course they should pursue; for Mrs. Roseboom testifies that defendant Biles, on being confronted by her with the information referred to, while admitting that the rent for 1906 was to be paid to the extent of $700 by way of the improvements mentioned, asserted that for each of the remaining two years the rent was $1,600, and defendant Biles does not explicitly deny making this statement. We have thus not found it necessary to consider the testimony objected to by defendants as incompetent under the Tennessee statute forbidding husband and wife to testify as to matters occurring between them by virtue or in consequence of the marital relation. We are satisfied, however, that complainants had knowledge of the contents of the Ross lease before the payment and discount referred to, and in April, 1908, when the lease was turned over to Mr. Roseboom. Complainants were thus, in our opinion, definitely apprised that the amount of rental paid by Ross had been misrepresented. We reach this conclusion upon these reasons: Whatever may have been complainants' understanding when the purchase was made as to the manner in which Ross was to pay his rent, Mrs. Roseboom had received in 1906 information which apparently caused her to believe that the rent paid by Ross was less than $1,600, and that complainants had been deceived and defrauded in that regard. The only reasonable construction of her testimony regarding her interview with Biles immediately following that information is that the latter assured her that the work done by Ross was to be paid in reduction only of the first year's rent. The necessary inference from her testimony is that she understood that the rent for the remaining two years was payable in money. Her knowledge affected both complainants. Reference to the lease itself showed that the money payable for each of the last two years was but $1,000. The natural effect of this discovery, taken in connection with the information received previous to the interview with Biles and the assurances given by the latter, was to apprise complainants that the amount of rental paid by Ross

had been materially misrepresented. We have not overlooked the consideration that the misrepresentation as to the rent paid by Ross was mischievous only so far as it indicated a rental value of that amount, and that mere discovery that the amount of rent was misrepresented would not in all cases conclusively amount to a discovery that the rental value was less than supposed. But the only misrepresentation as to the rental value was contained in the representation as to the rent Ross was paying. The two subjects, viz., Ross' rent and rental value, were intimately linked together, and had presumably a relation more or less close. The rent paid by Ross was naturally strong evidence of the actual rental value of the plantation, and was apparently so regarded by complainants. It is true that fraud without injury would give no ground for rescission; that the mere discovery that part of the representations are untrue is not necessarily a full discovery of the fraud; that had the tract acreage and the cultivated acreage turned out as represented, complainants' disappointment occasioned by the fact of Ross' smaller rent would have been less, and they might not have desired rescission. But, as we have said, the alleged misrepresentations as to acreage, either cultivated or in the tract, have not been satisfactorily established. But aside from this, it was not necessary to the putting of complainants to election that they should have known the causes of such decreased rental value.

In Mudsill Mining Co. v. Watrous, 61 Fed. at pages 186, 187, 9 C. C. A. at pages 438, 439, Judge (now Mr. Justice) Lurton said:

"Before a purchaser is compelled to elect whether he will affirm or disaffirm, he must be aware of the facts which raise such an election. Delay will not defeat his right to relief, unless the fraud was known to him or ought to have been known by due diligence." And again: "Neither rumors nor suspicion required an election. Either would demand diligence in effort to discover the truth, for, after facts are known calculated to excite suspicion, laches would be imputed if there was negligence in inquiry."

And in Alger v. Keith, 105 Fed. at page 120, 44 C. C. A. at page 386, the same learned judge said that in cases such as there presented "courts of equity will look with some indulgence when the defense is laches or acquiescence, and require very clear evidence that the defrauded party has assented after full knowledge of the fraud and his rights in the matter." The two cases last cited are relied upon by complainants, but are readily distinguishable from the case before us.

In the Alger Case, complainant was held not to have lost the right of rescission by reason of payment of deferred installments of purchase price after knowledge that misrepresentations had been made as to the thickness of veins of coal in the land bought or by long delay thereafter in filing bill to rescind. And in the Watrous Case it was held that complainants did not lose such right by remaining in possession of the mining property several months after they discovered that it had been "salted." But in each of those cases the purchaser had bought upon his own examination or that of his agent, and there was no right of rescission by reason of the discovery, in the one case of the mere act of "salting," or in the other case of the

mere fact of misrepresentation as to thickness of coal veins. Proof of defendant's actual complicity in the fraud was required (in the Alger Case of the bribery of complainant's agent, and in the Watrous Case of the defendant's complicity in the "salting"), and the right to rescind was held not to be lost until such proof was discovered. Here the alleged fraud of defendants, relating to the rental paid, was the fact claimed to have been shown by the Ross lease.

Complainants were thus charged, by the information given by the Ross lease, with the duty of electing promptly whether to affirm the contract and hold on to the land (which would have left a right of recovery for such legal damages as had been suffered by defendants' action), or to disaffirm and repudiate the contract and rescind the sale. The two remedies are absolutely inconsistent.

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose." Grymes v. Sanders, 93 U. S. 55, 62 (23 L. Ed. 798).

As expressed by Judge Lurton in Mudsill Mining Co. v. Watrous, 61 Fed. at page 186, 9 C. C. A. at page 437:

"When a purchaser acquires knowledge that he has been defrauded, he has an election of legal remedies. He may keep the property and sue for damages, or repudiate the contract and demand rescission. These remedies are not concurrent, but inconsistent, and the adoption of one of necessity excludes the other. The rule is well settled in equity that after knowledge of the fraud the party must within reasonable time make an election as to whether he will affirm the trade, notwithstanding the fraud, or offer to restore the property and demand the return of his purchase money. If, after the knowledge of the facts which entitle him to rescind, he deal with the property as owner, it is evidence of acquiescence and an affirmance of the contract. The authorities to this point are numerous, and the principle well settled."

See, also, McLean v. Clapp, 141 U. S. 429, 432, 12 Sup. Ct. 29, 35 L. Ed. 804; Shappirio v. Goldberg, 192 U. S. 232, 242, 24 Sup. Ct. 259, 48 L. Ed. 419, and cases cited in Mudsill Mining Co. v. Watrous, 61 Fed. at page 186, 9 C. C. A. at page 437.

The rule is well settled that any decisive act of a party, with knowledge of his rights and of the facts, determines his election in the case of inconsistent remedies (Robb v. Vos, 155 U. S. 13, 15 Sup. Ct. 4, 39 L. Ed. 52; Stuart v. Hayden, 169 U. S. 1, 15, 18 Sup. Ct. 274, 42 L. Ed. 639), and an election to rescind or not to rescind a contract once made is final and conclusive (Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420). It is true that bringing suit upon a contract is one of the most unequivocal acts of affirmance; but suit is not in all cases necessary to election. "Taking any steps to enforce the contract was a conclusive election not to rescind it on account of anything known at the time." See Robb v. Vos, supra, 155 U. S. at page 42, 15 Sup. Ct. at page 14 (39 L. Ed. 52). Actual collection without suit of the note given by defendants for the 1908 rent was as effective an election as collection by suit would have been. The

accomplishment without suit of the result sought by suit is, if anything, more effective evidence of an election than the mere bringing of suit, which, though subsequently discontinued, has been held conclusive evidence of election. Thomas v. Watt, 104 Mich. 201, 62 N. W. 345, and cases cited; Cooper v. Smith, 109 Mich. 458, 67 N. W. 516. The payment of an installment of purchase price is not highly significant of an election, but the exercise by a buyer of acts of ownership over the property bought which are inconsistent with the right to rescind the contract constitutes a waiver of such right. Thomas China Co. v. C. W. Raymond Co. (C. C. A. 6) 135 Fed. 25, 27, 67 C. C. A. 629; Joslyn v. Cadillac Automobile Co. (C. C. A. 6) 177 Fed. 863, 869, 101 C. C. A. 77. When complainants discounted defendants' note for the 1908 rent, the rental was but partially earned. What could be a more effective exercise of ownership over the plantation than the collection of defendants' note for its future use? The doctrine of election so applied is distinct from laches and acquiescence. See Shappirio v. Goldberg, supra, 192 U. S. at page 242, 24 Sup. Ct. at page 259 (48 L. Ed. 419). It is to be noted that during the eight months which passed after knowledge of the terms of the Ross lease, and before suit was begun (five months of which time was subsequent to the survey), no suggestion of rescission was made by complainants, the demand upon defendants being, in substance, that they "make good"; and on July 28, 1908, after the results of the survey were fully known, we find Roseboom calling upon Biles to carry out an alleged "guaranty" (apparently claimed to have been made subsequent to the purchase) that he could rent the place at $1,600 per year after the expiration of the Ross lease, and at the same time proposing to hold Corbitt liable for his alleged misrepresentations.

In our opinion, complainants must be held to have ratified the purchase, and the decree of the Circuit Court is, accordingly, affirmed with costs.