PRINCESS AMUSEMENT CO. v. WELLS.[*]

WELLS v. PRINCESS AMUSEMENT CO.

(Circuit Court of Appeals, Sixth Circuit. February 19, 1921.)

Nos. 3437, 3438.

1. **Contracts ⊕187(1)—Equity can entertain suit on contract made for complainant's benefit.**

One for whose benefit a promise is made, though not himself the promisee, may sue in equity for the enforcement of the promise; it being immaterial that the suit might have been maintained by the promisee.

2. **Courts ⊕347—Under federal equity rule, answer held admission of defendant's refusal to sue on contract for plaintiff's benefit.**

Where plaintiff brought suit on a contract for his benefit against the promisee and the promisor, and alleged that the promisee had refused to bring the suit, an answer by the promisee that it made no claim to the sum involved and had no interest in the litigation, without denial that it refused to bring the suit, is, under equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), confession of that allegation.

3. **Contracts ⊕202(2)—Facts held to sustain finding plaintiff breached promise not to exhibit "vaudeville."**

The fact that, subsequent to the making of a contract in which he promised not to exhibit vaudeville in his theater, plaintiff exhibited musical tabloids, in connection with which there were specialties between the acts, while the scenes were being shifted, warrants the District Judge in finding that plaintiff had breached his promise, though it would seem that the presentation of musical tabloids, without the specialties, would not have been vaudeville.

4. **Contracts ⊕312(4)—Agreement to refrain from exhibiting vaudeville held not sole consideration, so that breach thereof was only partial breach of contract.**

In a contract between plaintiff and defendant, who were competing theater proprietors, and a booking office whereby plaintiff's exclusive right to booking privileges of the office were transferred to defendant, and plaintiff promised to refrain from exhibiting vaudeville in his theater during the contract, and was to receive a stipulated weekly payment, the promise to refrain from the exhibition of vaudeville was not the sole consideration for the weekly payments, and hence a breach of such promise was a partial breach only.

5. **Contracts ⊕273—Party cannot partially repudiate for other's breach.**

A party to a contract cannot repudiate, after breach by the other, only the payments he was required to make under the contract, while retaining benefits he obtained thereby.

6. **Contracts ⊕318—Partial breach does not forfeit all rights.**

Where plaintiff promised to refrain from exhibiting vaudeville during the 5-year term of a contract between himself, defendant, and a booking office in return for stipulated weekly payments, the breach of such promise for 22 weeks of the period does not forfeit his rights to the weekly payments for the entire period, unless such forfeiture was expressly agreed upon by the parties.

7. **Contracts ⊕318—Agreement held not to require forfeiture for partial breach.**

Where one of three contracts simultaneously entered into provided that, if plaintiff's grantee should conduct vaudeville in the theater, the stipulated payments to plaintiff under another of the contracts should cease during the continuance of such competition, but revive on cessation thereof, the breach of plaintiff's promise to refrain from exhibiting

---

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[*]Certiorari denied 254 U. S. —, 41 Sup. Ct. 623, 65 L. Ed.,—.

vaudeville for a portion of the 5-year period did not, under the contract, forfeit his rights to the weekly payments for the entire period, though a letter by defendant stated that payments were to be made so long as plaintiff lived up to his agreement; that letter not being shown to have been brought to plaintiff's attention, and not expressly providing for forfeiture of all payments for plaintiff's breach.

**8. Damages ☞190—Evidence held to permit award of damages for breach of contract not to show vaudeville.**

    In an action for the stipulated payments to be made under a contract whereby plaintiff agreed not to exhibit vaudeville in his theater during the term, evidence of the comparative receipts in plaintiff's and defendant's theaters during the contract period, including the time when plaintiff was exhibiting vaudeville in violation of his promise, *held* sufficiently to establish the damage to defendant by the breach of his promise to entitle the defendant to an award of such damages as an offset to the recovery by plaintiff of the stipulated payments.

Appeal from the District Court of the United States for the Middle District of Tennessee; Edward T. Sanford, Judge.

Suit by Jake Wells against the Princess Amusement Company and another. Decree for the complainant against the named defendant for a part only of the amount claimed, and complainant and the named defendant appeal. Reversed and remanded, with directions.

Jordan Stokes, Sr., of Nashville, Tenn. (Moe Levy and Stokes & Stokes, of Nashville, Tenn., on the brief), for plaintiff.

W. C. Cherry and T. T. McCarley, both of Nashville, Tenn. (J. G. Stephenson, of Nashville, Tenn., on the brief), for defendant Amusement Co.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Wells owned a vaudeville theater at Nashville, Tenn., called the Orpheum. He had an exclusive contract with the United Booking Offices for booking vaudeville attractions at the Orpheum. The Princess Amusement Company also owned a vaudeville theater at Nashville, called the Princess. The two theaters were in active competition. An agreement whereby Wells' competition in vaudeville should be eliminated and the Princess should obtain the exclusive right to vaudeville bookings from the United Booking Offices was evidenced by three simultaneous written contracts, dated November 25, 1912, being (1) an agreement (Exhibit A) between the Princess Company, the Booking Offices, and Wells, whereby the Booking Offices agreed to book vaudeville attractions for presentation each week at the Princess for at least 35 consecutive weeks in each vaudeville season for a period of 5 years—the Princess Company agreeing to take such attractions only from the Booking Offices. The Princess Company agreed to pay to the Booking Offices $100 per week for each week that the Princess should be operated (plus a certain commission on salaries of the vaudeville "attractions"). Wells agreed not to operate a vaudeville theater in Nashville so long as the Princess faithfully performed the agreement stated. (2) By the second contract (Exhibit B) the Booking Offices agreed to pay Wells $75

each week that it should receive the $100 from the Princess Company. While not in terms expressed in the contract, Exhibit A, it was definitely understood between all the parties that Wells was to receive $75 per week out of the $100 to be paid by the Princess Company; the contract, Exhibit B, expressly reciting such payment as one of the considerations for Wells executing the agreement, Exhibit A. (3) By the third contract (Exhibit C) the Princess Company and the Booking Offices agreed that in case Wells should sell the Orpheum, and the purchaser should conduct a competing vaudeville theater, the payments of $75 per week referred to should be discontinued "during the period of such competition, but not longer; the same to be revived and continued on the cessation of such competition." [1] For 22 weeks immediately following the taking effect of these contracts the Orpheum exhibited what is called musical tabloid. The Princess Company, claiming that this production was a breach of Wells' agreement not to operate a vaudeville theater, refused to pay to the Booking Offices the $75 per week which was to go to Wells, paying, however, the remaining $25 plus the commissions on salaries, and receiving bookings under its contract with the Booking Offices for the full 5-year period. On October 5, 1915, Wells brought suit on the equity side of the court below for the recovery of the agreed payments of $75 per week. The meritorious defense was made that Wells, by exhibiting the so-called musical tabloid for 22 weeks, had broken his contract, and so was entitled to recover nothing. [2]

Upon hearing on pleadings and proofs, the District Court held that Wells had violated his agreement by the 22 weeks operation in question, but that the Princess Company, having retained the full benefit and consideration otherwise, including Wells' surrender of his exclusive contract with the Booking Offices and the procuring of the latter's contract with the Princess Company, was liable to Wells for the amount of the agreed weekly payments, subject to the right of the Princess Company to recover such damages as it had suffered from Wells' breach. The master, to whom the ascertainment of such damages was referred, found that sum to be $9,906.27. The District Court set aside the master's findings for reasons hereafter stated, and entered decree in Wells' favor for $17,100 (the amount of the agreed weekly payments), with interest from the filing of the bill of complaint on the amount then due, and on the weekly payments subsequently accruing from the time they respectively became due. Both parties appeal—Wells, on the ground that his showing of musical tabloid was not a breach of his contract; the Princess Company, not only because of the decree against it for the agreed weekly payments,

---

[1] Wells owned a considerable string of vaudeville theaters, including, besides the Orpheum, theaters at Knoxville and Chattanooga, Tenn. Contemporaneously, and as part of the transaction between the Princess Company, Wells, and the Booking Offices, the competing Knoxville and Chattanooga theaters made similar agreements with the Booking Offices and Wells. Those contracts are not in issue here.

[2] Other more or less technical defenses were made, which it is unnecessary to state here.

but because it was disallowed damages. Its further defenses will appear in the course of this opinion.

[1] 1. *Jurisdiction.* (a) The Princess Company contends that the present suit is not one of equitable cognizance. This contention is without merit. The rule is well settled that one for whose benefit a promise is made, though not himself the promisee, may sue in equity for the enforcement of the promise. It is immaterial that the suit might have been maintained by the United Booking Offices.

[2] (b) The bill in the present suit was filed by Wells, as sole complainant, against the Princess Company and the Booking Offices. The District Court overruled a motion to dismiss on the ground that Wells had failed to prove that the Booking Offices had refused to join with him in bringing the suit or to lend him the use of its name. The bill alleged the Booking Offices' refusal to institute suit or permit its name to be used for such purpose. The Booking Offices answered that it made no claim to the sum sought to be collected, had no interest in the litigation, and did not ally itself with either of the other parties. The District Court correctly held that the failure of the Booking Offices to deny the allegation that it had refused to bring the suit must be deemed confessed under the Thirtieth equity rule (198 Fed. xxvi, 115 C. C. A. xxvi), and that its refusal to join as plaintiff may be inferred. Osgood v. Franklin, 2 Johns. Ch. (N. Y.) 1, 7 Am. Dec. 513. It is thus immaterial that in a former suit by Wells against the Princess Company alone the Booking Offices had been held a necessary party. There is nothing in the record of the previous suit in the state court by the Booking Offices against the Princess Company which militates against this conclusion. Moreover, Wells is not suing as assignee of the Booking Offices' rights, nor in its interest. So far as concerns federal jurisdiction, through diversity of citizenship, it is immaterial whether the Booking Office is aligned with complainant or defendant. Wells will hereafter be called plaintiff, and the Princess Company will be called defendant.

2. *Did Plaintiff Violate His Contract?* The concrete question is whether, by producing musical tabloid, he in effect operated a vaudeville theater. Plaintiff produced 12 witnesses, including himself, all experienced in the theatrical world, including theatrical managers, a manager and producer, an operator and owner, a vaudeville promoter, and the editor of a theatrical paper. Their testimony tended to show the existence of a well-defined distinction between vaudeville and musical tabloids—vaudeville consisting of a number of unrelated acts put together, thereby forming a varied or variety bill, the actors being separately engaged, and the performance having no plot; while musical tabloid, which originated but shortly before the contract in question was made, consists of a condensation of a musical comedy, given as an entirety by one company (paid as such), preserving the plot of the play, the costumes, etc., but cutting out the dialogue, and perhaps otherwise abbreviating the performance, as well as lessening the number of performers, so enabling the presentation of the same performance several times a day and at low prices.

On the other hand, musical tabloids seem to have been devised to

meet the demand for attractive, low-priced shows; they were generally adopted as part of vaudeville entertainments, and were booked and played as such, both before and after the contract was made, not only by the defendant, but by plaintiff elsewhere than at the Orpheum. There was testimony that the profession regarded theaters showing musical tabloids as vaudeville theaters, not being otherwise found in either of the four general divisions of legitimate, vaudeville, burlesque, and moving picture. There was testimony that one of the reasons why defendant wished to eliminate plaintiff was to enable it to get musical tabloid as part of vaudeville, and that in the negotiation of the contract plaintiff did not suggest that he intended to exhibit tabloids. Defendant also invokes certain dictionary and other definitions of vaudeville, referred to in the margin of this opinion.[3]

From this record, we should hesitate to conclude that when the contract was made there was any well-recognized classification of musical tabloids as necessarily vaudeville. The fact that musical tabloids would naturally and frequently form part of vaudeville shows might well account for their being booked, advertised and regarded as vaudeville attractions; i. e., as parts of a "variety" performance. Being low-priced, they would naturally be exhibited in vaudeville or low-priced theaters. Indeed, it does not satisfactorily appear that previous to the making of plaintiff's contract strictly musical tabloid had been exhibited without the addition of unrelated specialties. From this record, we should be disposed to think that musical tabloids when so produced were not vaudeville. True, they competed more or

[3] The Standard Dictionary: "A gay song; a dramatic piece in which there are light or comic songs; a theatrical entertainment consisting of (1) a slight dramatic sketch or pantomime *interspersed with songs or dances*; (2) a series of short sketches, songs, dances and acrobatic feats *having no dramatic connection.*"

"Encyclopædia Britannica: "In English usage vaudeville is practically synonymous with what is generally known as musical comedy; but in America it is applied also to music hall *variety entertainments.*"

Webster, 1859: "A short comic piece *interspersed with species of light songs.*" Webster, 1884: "A theatrical piece, usually a comedy the dialogue of which is *intermingled with light and satirical songs sung in familiar airs.*" Webster, 1913: "A theatrical entertainment consisting of a slight dramatic sketch or pantomime *interspersed with songs and dances.*"

Appleton's Encyclopedia (1911): "Entertainment interspersed with music and having *humorous or satirical allusions* to current topics of the day."

De Koven's 1894 article on Vaudeville: "In the French sense of the term, it means a comedy of more or less farcical order, in which a certain number of songs, ballads, *rarely concerted numbers*, usually incidental to and *without particular reference to the action*, have been so to speak inserted."

Universal Encyclopedia: "A name applied to a light kind of dramatic entertainment, an entertainment interspersed with music and *having humorous and satirical allusions to current topics of the day.*"

From articles in "Variety," a theatrical paper:

Schenchk's statement (1913): "The current musical comedies are nothing more than vaudeville shows lacking variety."

O'Connor's article (1912): "A tabloid for vaudeville is a musical comedy condensed, chorus girls, *comedians and comediennes.*" And again: "They provide entertainment that draw patrons from the *burlesque house* and the *vaudeville theaters.*"

All italics in this opinion, both in text and notes, are ours.

less with vaudeville, certain patrons of the one being patrons of the other; but the same is true of motion pictures as related not only to vaudeville, but to the legitimate theater; which is but to say that if there were no motion pictures both vaudeville and legitimate would be better patronized, and vice versa; but such competition does not put them all in the same class. Defendant's manager gives what seems to us a correct statement of the distinction between musical tabloid and vaudeville, viz.: That where the exhibition is confined to a musical tabloid in which the plot and the characters taken by different actors are preserved, to produce "just one whole play by itself," without any special independent features brought into it, it is not vaudeville, but that if, in connection with the musical tabloid, during the intermissions between the scenes or acts, other features are put on, it is vaudeville.

[3] It appears that plaintiff withdrew his newspaper advertisement of the Orpheum as a vaudeville theater, and its operator, at the time the musical tabloids in question were produced, testified that there were "no separate vaudeville acts with these tabloids during the time we were playing them." He said, however, that during the exhibition "there were frequently specialties in between the acts while the scenes were being shifted. The specialties were in connection with the thread of the show, given by people in the show." This testimony fairly indicates that in connection with the musical tabloids there were given disconnected features, by way of an additional entertainment, thus indicating a performance more or less vaudeville in character. Naturally, the only object of introducing special features was to make the performance more attractive than the tabloid alone would be. This impression is heightened by the Orpheum's street car advertisement of December 9, 1912, which refers to "*Keith Vaudeville*, a musical frolic in three divisions. The time, place and girl. 20 people, mostly girls"— as well as by the Orpheum's program for the week of January 20, 1913, presenting "Vaudeville's Musical Comedy Stars, Edward Joly and Winnifred Wilde, and their tabloid musical comedy aggregation, presenting 'Over Night in Boston'—a mixture of vaudeville and pretty girls in one large act, with three scenes"; [4] also by the fact that the same musical tabloids were billed and advertised in other cities as vaudeville acts. If tabloid was ever given without specialties, plaintiff was able to show it, and should have done so. We hence conclude that the District Judge was justified in finding that Wells violated his agreement during the 22 weeks.

[4] 3. *The Effect of Plaintiff's Partial Breach of the Contract.* Defendant contends that the sole consideration for its promise to make the weekly payments was plaintiff's agreement not to operate a vaudeville theater, and so invokes the rule that one who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform. We think it plain, however, not only from the record generally, but from the written contracts them-

---

[4] We have not overlooked the explanation given of this reference to vaudeville.

selves, that the consideration for the weekly payments was not merely plaintiff's agreement not to operate a vaudeville theater, but included his surrender of his existing booking contract and the turning of the same over to defendant.[5]

[5] We find in the record no competent evidence to the contrary of our conclusion. Plaintiff's breach did not go to the entire consideration for defendant's promise to make weekly payments. If defendant had repudiated the contract by reason of plaintiff's partial breach, the entire failure of consideration would have defeated action for the weekly payments; but under elementary principles defendant could not rescind so much only as related to the weekly payments, and at the same time hold onto the remaining consideration received from plaintiff. Lyon v. Bertram, 20 How. 149, 155, 15 L. Ed. 847; Thomas China Co. v. Raymond (C. C. A. 6) 135 Fed. 25, 67 C. C. A. 629; Roseboom v. Corbitt (C. C. A. 6) 196 Fed. 627, 634, 116 C. C. A. 301. The authorities cited by defendant contain nothing to the contrary of the obligation of a party to a contract, which has been broken by the other party, to elect whether or not to renounce it entirely for such breach. Instead of repudiating the contract, defendant has attempted to repudiate only its own payments; it has enjoyed the exclusive booking rights for the full 5-year term, and for nearly nine-tenths of that time entirely free from plaintiff's competition.

[6, 7] The record affords no room for a claim of continuing breach by plaintiff throughout the term of the contract. Relief from the weekly payments during the entire 5-year term would thus be unconscionable and unwarranted, unless such result was expressly agreed upon by the parties. Bradford v. Furniture Co., 115 Tenn. 610, 92 S. W. 1104, 9 L. R. A. (N. S.) 979. Such is not the case. The contract, Exhibit A, between plaintiff, defendant, and the Booking Offices contains no provision for forfeiture, or even for damages in case of plaintiff's default, although making provision for payment of liquidated damages by defendant in case of its breach. The contract, Exhibit C, between defendant and the Booking Offices provides that in case plaintiff's grantee of the theater should conduct vaudeville, the weekly payments of $75 going to plaintiff "shall be discontinued during the period of such competition, but no longer; same to be revived and continued on the cessation of such competition." True, the letter accompanying the return by defendant to the manager of the Booking Offices of the contract, Exhibit A, states that—

"The contract is executed and delivered with the understanding, although not recited therein, that of the weekly payments which we are obligated to make $75 is to be paid Wells, *so long as the terms of his contract are lived up to by him,* but if he breaches his contract he forfeits the $75 weekly payments, to say nothing of any further damage that might result to us in the event of such breach of his contract by him."

---

[5] The contract, Exhibit A, to which defendant was a party, not only recites that the Booking Offices "is obligated to said Wells to book and secure vaudeville attractions exclusively for said Wells" in Nashville, and plaintiff's willingness "to consent that the Booking Offices may book vaudeville acts for" defendant; but expressly states that "Wells hereby consents to the Booking Offices executing this agreement," etc.

But not only is it not clear that this statement was brought to plaintiff's attention before the contract took effect, but the statement does not necessarily, or even naturally, suggest that defendant would claim a forfeiture of weekly payments during the entire 5-year term as the result of any competition whatever on plaintiff's part, no matter for how short a period. On the contrary, considered in connection with Exhibit C, the statement would naturally be interpreted to mean "during the period of such competition." The very provision for weekly payments, continued until the end of the 5-year period, instead of the payment of a lump sum on the making of the contract—thus providing against breaches by plaintiff until the very end of the contract period—negatives the idea that plaintiff's refraining from competition was a condition precedent to any recovery by him, and that the two considerations were nonseverable.

Moreover, this case is in equity, and equity does not favor forfeitures. The case is not one for the application of the doctrine of "unclean hands," especially in view of defendant's attempted repudiation of all liability. We therefore conclude that defendant is liable for the weekly payments, unless for the 22 weeks in question. Further discussion of the manner of relief for that period is postponed to the consideration of the question of damages.

[8] 4. *The Damages.* It appeared by the testimony taken by the master that during the 23 weeks immediately preceding the taking effect of the contract, viz. from July 1, 1912, to December 9, 1912 (which we shall call the first period), the Princess played 6 weeks of tabloid vaudeville, the receipts from which averaged $2,046.84 per week; that during the remaining 17 weeks of that period the Princess exhibited separate-act vaudeville, the receipts therefrom averaging $1,400.91 per week—making a weekly average for the entire 23 weeks from both tabloid and separate-act vaudeville of $1,589.60. It further appeared that during the first 22 weeks of the contract period (which we shall call the second or competing period), during all of which time Wells was exhibiting tabloid at the Orpheum, the Princess exhibited 11 weeks of separate-act vaudeville, the weekly receipts therefrom averaging $1,650.27, and 11 weeks of tabloid vaudeville, with average weekly receipts of $2,045.63; that during the 7 weeks (which we shall call the third period) immediately following this second or competing period the Princess exhibited tabloid vaudeville for 4 weeks with average weekly receipts of $2,012.28, and 3 weeks of separate-act vaudeville with average weekly receipts of $1,548.30—making an average from both kinds of shows during the 7 weeks of $1,813.39. From these figures the master correctly deduced that the Princess received during 6 weeks of the first period, when it was playing tabloid vaudeville and the Orpheum was playing separate-act vaudeville only, a weekly average of $645.93 more than when the Princess was playing separate-act vaudeville; also that during the 11 weeks of the second, or competing, period, when the Princess played tabloid vaudeville and the Orpheum gave the same kind of entertainment, the Princess' weekly receipts averaged $395.35 more than when it played separate-act vaudeville. The master concluded that during the 11

weeks of the competing period during which the Princess played tabloid vaudeville it was damaged by Wells' competition by the difference between $645.93 and $395.35, or an average of $250.55 per week; and that during the 11 weeks while the Princess was unable to get tabloids its damage was $645.93 per week, being its surplus receipts from tabloid vaudeville as against separate-act vaudeville during the 6 weeks prior period.[6] The master awarded damages at $250 per week for 11 weeks and $650 per week for the remaining 11 weeks of competition. The district court set aside the master's findings, for the reason that, in the court's opinion, the damages were not proven with reasonable certainty, but were merely conjectural and speculative.

That tabloid vaudeville proved much more popular and profitable than separate-act vaudeville clearly appears from a comparison of the Princess' average weekly receipts from tabloid and separate-act vaudeville, respectively, during the three periods stated, viz.: During the first period $2,046.84 for tabloid as compared with $1,400.91 for separate-act vaudeville; during the second period, $2,045.63 as compared with $1,650.27; and during the third period $2,012.28 as compared with $1,548.30. The master's findings of the measure of the Princess' damage would be quite persuasive if, first, the data presented are sufficient to enable a proper comparison of the results of the period of competition as compared with noncompetitive periods; and, second, the finding be not overcome or seriously weakened by other and practical considerations.

The master's conclusion receives tangible support from the further facts: (a) That in the third period, while the Princess was playing musical tabloid, its average weekly receipts were $463.92 more than when playing separate-act vaudeville—the Orpheum giving during that period plays which did not compete with the Princess; (b) that the Princess was not operated to full capacity during the 11 competitive weeks of musical tabloid, as evidenced by the fact that its average weekly receipts were $519.32 less than in the most productive one of those weeks, and nearly $500 less than in 2 or more others of those weeks; and (c) the testimony of the Princess' manager, given without cross-examination and without direct dispute, that the Princess' receipts during the 22 weeks' competitive period were greatly below normal, although his estimates of the extent of subnormality were probably extravagant.

We think, however, defendant's experience during 6 weeks of tabloid previous to the contract period and 11 weeks during that period not such as alone to furnish an unqualifiedly safe measure of damages. During the 6-weeks period the Orpheum played no tabloids. The presence of other theatrical attractions (the record does not show the extent of the same) would naturally affect attendance at both the competitive theaters, and the attendance at both is shown to have sub-

---

[6] It would seem that receipts may properly be used for purposes of comparison in place of profits, as the cost of producing tabloid and separate-act vaudeville appears to be substantially the same, and it seems to be taken for granted (at least inferentially) throughout the record and briefs of counsel that the admission prices were the same for both classes of shows.

stantially varied at different seasons of the year, being larger throughout the cooler months than in the warmer periods,[7] although the 23 weeks of the first period added to the contract period made up substantially the theatrical year. It does not, however, necessarily follow that the first and second halves of the year would normally average the same in respect to receipts.

There are also practical considerations opposed to the absolute adoption of the master's theory: (a) During the 11 weeks of the competing period when both the Princess and the Orpheum were playing tabloid, the former's average weekly receipts were but about a dollar less than during the 6 weeks of the earlier period, when the Princess was playing musical tabloid and the Orpheum was playing separate-act vaudeville; (b) during the 11 weeks of the competitive period, while the Princess was playing separate-act vaudeville and the Orpheum was playing tabloid, the Princess' average weekly receipts were about $250 more than during the 17 weeks of the first period, when both the Princess and the Orpheum were playing separate-act vaudeville; (c) the average weekly receipts of the Princess during the 22 weeks of competition (during 11 of which the Princess played tabloids) were nearly $280 more than during the preceding 23 weeks, when the Princess played tabloids for but 6 weeks, and the Princess' average weekly receipts from tabloids during the second period were about $33 larger than during the third and wholly noncompetitive period, although it seems at least a partial aswer to the considerations stated in this subdivision, that the competing period was probably more profitable naturally than the 7 weeks of the third period; (d) the Princess' average weekly receipts during the 3 weeks of the third period, while the Orpheum was not competing in any way, were about $100 less than during the 11 weeks of the competing period, while the Princess was giving separate-act vaudeville and the Orpheum was playing musical tabloids.

Again, the Orpheum's receipts did not generally vary to anything like the same extent as those of the Princess. During the 6 weeks of the first period, while the Princess was playing tabloid and the Orpheum separate-act vaudeville, the Orpheum's average weekly receipts were $1,248.86; during the six weeks of the first period when the Princess and the Orpheum were both playing separate-act vaudeville, the latter's average weekly receipts were $1,218.16; and during the 11 weeks of the competing period (between January and May), while both theaters were playing tabloid, the Orpheum's average weekly receipts were $1,208.49.

But while we are unable to adopt the master's measure of damages, and while it is manifestly impossible to compute defendant's damages with entire mathematical accuracy, we think the record affords sufficient data for a reasonably certain determination, taking into account all the various considerations applicable thereto, and this, we think, is all that is required. Weinman v. De Palma, 232 U. S. 571–575, 34

---

[7] The Princess closed for about 2 months during the extreme hot weather of summer.

Sup. Ct. 370, 58 L. Ed. 733. The record is such as would justify submitting to a jury the question of damages were the case at law. Compare Hollweg v. Schaefer Brokerage Co. (C. C. A. 6) 197 Fed. 689, 701, 117 C. C. A. 83.

We think it a significant and helpful consideration that during the 11 weeks of the competing period, while the Princess was playing separate-act vaudeville and the Orpheum was playing tabloid, the latter's weekly average receipts were practically $200 more than during the other periods to which we have called attention, and the fact of this excess is all the more significant when considered in connection with the comparative stability of the Orpheum's receipts during the other periods mentioned. When to this is added the comparative uniformity of the Princess' receipts when giving musical tabloids and the very large falling off of its receipts during the period of the Orpheum's competition by musical tabloid, we think it a safe and conservative conclusion that defendant suffered damages averaging at least $200 per week (less the $75 weekly payment, which otherwise it would have to pay) during the entire 22 weeks of competition. Beyond this we do not feel justified in going. As this competitive period was equally divided, so far as the Princess is concerned, between tabloid and separate-act vaudeville, it is not necessary to apportion the weekly damage between the two periods. We think the award should extend over the entire 22 weeks of competition.

We are unable to agree with the conclusion of the learned District Judge that there is an absence of evidence that defendant endeavored to obtain the musical tabloids which plaintiff exhibited during the competitive period. As we understand the record, it shows that plaintiff, shortly before the contract was made, booked for his string of theaters a long list of musical tabloids; that defendant's manager in effect asked the Booking Offices for the booking of these tabloids; that the latter recognized defendant's right thereto and endeavored to induce plaintiff to consent to it; that plaintiff refused to do so, and that but for such refusal the Booking Offices would have booked them, or caused them to be booked, to the Princess. If tabloids were vaudeville attractions the Booking Offices was under duty to the Princess to book them for it, and it was equally plaintiff's duty, not only not to interfere with such bookings, but to aid in carrying them out, and thus comply with his express consent "that the Booking Offices may book vaudeville acts for the [Princess] theater company exclusively."

Our order will be that the judgment of the District Court be reversed, and the record remanded, with directions to enter a new decree awarding complainant on account of the agreed weekly payments $17,100, with interest thereon (as awarded by the court below), and to award defendant damages against complainant in the sum of $4,400, with interest thereon from the filing of this opinion. As the plaintiff thus recovers the full amount of the weekly payments, there should be no deduction from the damages on their account. The defendant will recover costs of this court.